[Cite as *State v. Woods*, 2023-Ohio-3549.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                      Court of Appeals No.  L-22-1195

      Appellee                               Trial Court No.  CR0202001034

v.

Verlando Woods                                **DECISION AND JUDGMENT**

      Appellant                              Decided:  September 29, 2023

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**ZMUDA, J.**

**{¶ 1}** Appellant, Verlando Woods, appeals the judgment of the Lucas County

Court of Common Pleas, sentencing him to an aggregate prison term of 21 years to life

after a jury found him guilty of murder in violation of R.C. 2903.02(B) and 2929.02, an

unclassified felony, and three counts of felonious assault in violation of R.C. 2903.11(A)(2) and (D), each felonies of the second degree, with a firearm specification as to the murder and the felonious assault counts, pursuant to R.C. 2941.145(A), (B), (C), and (F).  For the reasons that follow, we affirm.

## I.  Introduction

{¶ 2} On December 29, 2022, appellant shot and killed A.P. and injured three of his companions, P.L., C.B., and E.W.  When police arrived, appellant claimed he opened fire in self-defense.  Police took appellant into custody, and on January 8, 2020, appellant was charged in a seven-count indictment with the following:

Count 1: Murder in violation of R.C. 2903.02(A) and 2929.02, purposely causing the death of A.P.;

Count 2: Murder in violation of R.C. 2903.02(B) and 2929.02, causing the death of A.P. as a proximate result of committing or attempting to commit felonious assault;

Count 3: Felonious assault in violation of R.C. 2903.11(A)(2) and (D), regarding A.P.;

Count 4: Felonious assault in violation of R.C. 2903.11(A)(2) and (D), regarding C.B.;

Count 5: Felonious assault in violation of R.C. 2903.11(A)(2) and (D), regarding P.L.;

2.

Count 6: Felonious assault in violation of R.C. 2903.11(A)(2) and (D), regarding E.W.;

Count 7: Felonious assault in violation of R.C. 2903.11(A)(2) and (D), regarding L.T.

Each count also included a firearm specification, pursuant to R.C. 2941.145.

{¶ 3} On June 13, 2022, a jury trial commenced. The following is the story of the shooting, as depicted in testimony.

{¶ 4} Appellant lived in one of the two, top-floor apartments in his building. Across the hall from appellant was his neighbor, Lindsay, and her young children. His mother and stepfather lived in one of the first-floor apartments. The newest residents, Kaylie and Victoria, resided in the apartment below appellant. Sounds carried through the building, and residents could often hear, from inside their apartments, the loud sounds and raised voices in neighboring apartments or loud sounds in the hallways and on the stairs.

{¶ 5} Prior to the shooting, appellant had confronted his downstairs neighbors, Kaylie and Victoria, to ask them to quiet down after overhearing an argument inside the women's apartment that disturbed his rest. According to appellant, he went downstairs and knocked, and heard Victoria shout that he should mind his own business. He knocked again, and when they answered, he asked the women to quiet down because he

3.

was sick. He then turned to go back upstairs, and Victoria pursued him and called him names, resulting in an argument in the hallway.

{¶ 6} Kaylie and Victoria had different versions of that encounter. Kaylie recalled arguing with Victoria, and then appellant knocked on their door. When Kaylie answered the door, appellant told her, "[Y]ou guys need to chill the hell out down here." He also seemed "very irritable." Kaylie told appellant they were good and shut the door, but Victoria opened the door and told appellant to mind his own business. Appellant responded by saying, "I'll smack the shit out of you and your bitch. And I'll lit this place up." Victoria, likewise, remembered appellant banging on their door, and as she came out of the bedroom, she saw Kaylie pushing appellant out and slamming the door in his face. Victoria opened the door to confront appellant, and she said appellant "came flying down the steps, got in my face and said I will smack you and your bitch." Victoria added that appellant made a lot of threats, including that he would "set this bitch off."

{¶ 7} Appellant, Kaylie, and Victoria all agreed that, in the midst of the confrontation in the hallway, appellant's stepfather came out of his apartment and calmed things down. Everyone then returned to their homes. Kaylie and Victoria each reached out to family, frightened by the encounter, with Kaylie reaching out to her father, Jeffrey, and Victoria calling her brother, Montrese.

{¶ 8} Montrese arrived soon after and went upstairs with the women to speak to appellant. The other upstairs tenant, Lindsey, heard an argument in the hallway outside

4.

her apartment, and checked through her peephole. She saw appellant and his girlfriend, DeMia, arguing with Kaylie and Victoria. Lindsey also saw another man with the women, who she later learned was Victoria's brother, Montrese. Then appellant's stepfather came upstairs and urged the group to stop fighting, which they did. Lindsay witnessed the fight and the resolution, and then Montrese and appellant shook hands before Montrese and the women returned to the apartment downstairs. Lindsey did not hear any other argument or even loud sounds prior to the gunshots, sometime later.

{¶ 9} Jeffrey did not get the message from Kaylie right away, as he was in a Brothers of Vengeance (BOV) motorcycle club meeting when she called. After the meeting ended, Jeffrey checked his cell phone and saw a message from Kaylie, stating someone was at her apartment. He called Kaylie back, noted she was a little "razzled," and told his son, A.P., that he was driving to Kaylie's apartment to check on her. A.P. decided to follow his father's truck, and he got into his own car with P.L., C.B., and L.T. as passengers. A.P.'s friend, E.W., also decided to go, and followed in his own vehicle. None of the men rode a motorcycle to the apartment complex, and none of the men were wearing their BOV vests or displaying weapons.

{¶ 10} The group arrived at the apartment building about 15-20 minutes after appellant's conversation with Kaylie, Victoria, and Montrese. Appellant claimed he heard the group drive into the parking lot and, from his window, saw as many as ten men exiting vehicles. Kaylie also heard the vehicles, but heard no aggressive sounds like

5.

revving engines or squealing tires. She met her father at the door to let him in, and the rest of the men followed behind him into Kaylie's apartment. Kaylie spoke with Jeffrey, letting him know she and Victoria were upset but also "over it." After Kaylie spoke with her brother, A.P. went upstairs to make sure everything was okay. P.L. was already headed upstairs, and the others trailed behind A.P., with Jeffrey remaining in the apartment with Kaylie and Victoria.

{¶ 11} P.L. testified that he reached appellant's door first, and he felt he was the best person to resolve the situation because of his lack of emotional involvement. P.L. was armed and had a permit to carry a concealed weapon, but he did not draw a weapon as he approached appellant's door. He knocked on the door three times, then A.P. appeared at his side, reached past P.L., and knocked again. P.L. saw no gun or other weapon in A.P.'s hand. He also testified that neither he nor A.P. kicked appellant's door. The other BOV members, E.W. and L.T., had also started up the stairs by this time, but none of the men had weapons drawn or displayed.

{¶ 12} After A.P. knocked, P.L. heard the first sounds from inside the apartment, the sound of the dead bolt unlocking. P.L. testified that A.P. attempted to ask who went to his sister's apartment, but before he could finish his question, the first gunshot rang out and A.P. fell. P.L. heard no words from the apartment prior to the shooting, and as the gunfire continued, P.L. and the other BOV members tried to find safety and cover, retreating down the stairs.

6.

{¶ 13} P.L. turned away from appellant's door to look at A.P. and felt himself get hit in the back. He saw C.B. standing still at the top of the stairs, in apparent shock, and tried to give C.B. cover while pulling him down the stairs. P.L. described the scene as follows:

> I turned my back to the door. I tried to cover up [C.B.] because he still wasn't moving. Heard more gunshots. I believe that that was potentially when I felt my hand get hit. [C.B.] kind of came back to life at that point and started to run down the stairs, and I jumped from the top stair down to the next landing.
>
> * * *
>
> Kind of ended up in a dog pile on that landing. [E.W.] and [L.T.] were able to get to their feet first and run down the next flight of stairs. [C.B.] and I tried to do the same thing and kind of collided into each other again, kind of didn't really ever make it fully vertical, then –
>
> * * *
>
> When we got to the edge of the next set of stairs leading down, at that point we just kind of crawled on our stomach, grabbed the next stair in front of us, and just kept pulling ourselves down. You know, trying to get back up to my feet hadn't worked. So at that point I was just scrambling to

try to get underneath the landing that I assumed he was standing on. If we got underneath him, he wouldn't be able to fire in our direction any more.

* * *

P.L. felt he had been hit multiple times as he fled, stating:

More than once for sure, but I couldn't tell you how many. I know that as we were crawling I remember chunks of the stairs flying up as bullets were hitting the stairs we were trying to crawl down. I remember [C.B.] saying that he had gotten hit again.

* * *

Managed to get down to the next landing. Was able to kind of scramble up to our feet or, you know, somewhat thereof, finished going down to the next landing to the main door, exited the main door.

{¶ 14} P.L. testified he made it out of the building with C.B., but he believed someone was in a window with a gun and could be shooting at them from inside, so he and C.B. stayed close to the building. P.L. attempted to take off his belt to use as a tourniquet on his leg to stop the bleeding, but could not manage due to his injuries. After E.W. came out of the building, E.W. applied a tourniquet for him. In addition to his hand injury, P.L. was shot through the right biceps and through his back, with the bullet exiting through his stomach. He was also shot twice in the thigh, with one of the shots traveling

8.

through both of his testicles, requiring reconstructive surgery. Finally, P.L. sustained a gunshot through his left leg, just above the knee.

{¶ 15} After P.L. was outside the building, "somebody said that [the shooter] was coming back down the stairs and looked like he was coming outside," and P.L. drew his weapon, attempted to roll to his side and aim his gun at the door. He was unable to hold the gun with his injured hand, however, and dropped it. The weapon was not recovered from the scene and remained unaccounted for at the time of trial, but P.L. testified that he never fired it.

{¶ 16} C.B., who had been the third man up the stairs, described the scene similarly to P.L. C.B. heard the knocks on the door as he walked up the stairs, and he did not hear A.P. or P.L. say anything or kick the door. C.B. testified, "Pretty much as soon as I got to the top I turned and there was bullets coming at me." C.B. never saw the door open and heard no sound from the apartment prior to the gunfire. C.B. indicated he heard gunfire and froze, stating, "I didn't know what to do. I tried to catch [A.P.] because he shot him right away. But he was – he was hurt pretty bad. So then he shot me, and I tried to turn around and run, but wasn't fast enough." C.B. did not see where E.W. or L.T. were, but testified, "I could only assume they were in front of me, because me and [P.L.] were pretty much getting shot the whole time coming down the stairs." C.B. testified that nobody was returning fire, and he was unarmed and did not see anyone in their group with a weapon. C.B. recalled the rest of the group making it outside of the building, and

9.

the door closing and locking them out, while he remained on his back on the bottom landing, trapped inside with the shooter. He thought someone from the building opened the door so that E.W. could drag him outside, and once outside, E.W. straightened his shattered leg to relieve C.B.'s pain. C.B. testified he knew L.T. had a permit to carry concealed, and he asked L.T. to "pull his gun out and if somebody came downstairs shoot them." He testified he did not want to get shot any more. Because of the active shooter, C.B. had to wait for medical treatment, but once he was taken to the hospital, he learned he sustained eight gunshot wounds, with the most serious injuries to his hand and leg. C.B. indicated his right hand remains "all messed up," and his femur was shattered, requiring a long hospitalization and several surgeries, leaving his injured leg an inch and a half shorter than his other leg.

{¶ 17} E.W. and L.T. were the fourth and fifth men up the stairs. E.W. was unarmed, and he heard three knocks on appellant's door, then the door opened and he saw a hand holding a gun, A.P. got shot, and everyone started fleeing. E.W. testified he dove down the stairs, and bullets and dust sprayed next to his head. C.B. landed on top of his legs, and he could feel "the bullets going into [C.B.] hitting the stairs between my legs." The gunfire continued until the group reached the bottom of the stairs and the entrance to the building. E.W. sustained graze wounds to his left arm and hand, and as he was otherwise uninjured, he attended to the others as much as he could until help arrived.

10.

{¶ 18} L.T. remembered following the others up the stairs, reaching the midway point to appellant's floor. He was armed and a had a permit to carry a concealed weapon, but did not have his weapon out as he climbed the stairs. L.T. heard knocking, then quiet, and then the deadbolt unlocking. After more silence, L.T. heard gunfire and he was shoved down the stairs. He testified:

> I just remember seeing like everybody toppling over each other and then I remember seeing like – like a bloody handprint on the wall. And I remember just – just – just seeing that people were like crawling. And then I – as I got pushed down to the like the second, I want to say the second part of the apartment, that's when I pulled out my gun and basically shoved everybody away from me and started to point up at the staircase and started to work my way down with them, because they were just basically crawling down because neither one of them could stand except for [E.W.].

L.T. testified that he never fired his weapon, explaining:

> We were at the bottom at the door and [C.B.] and [P.L.] were laying there on the floor and I remember I had my gun pointed at the edge of the staircase and because I didn't want – like, I didn't know who was shooting. I didn't know if that person was like running down the stairs or not. So I just kept my aim at that door and I tried to get [E.W.] to get them out of the door, but he couldn't lift [C.B.] or [P.L.] by himself. So we sat there for a

11.

second and I just kept my gun pointed at the door, at the hallway. And then I remember seeing a hand come around the hallway and then I realized the hand was too small and I realized at that point it was a kid and I had my gun pointed at a kid and I told him to go away and I remember him going into an apartment. And I want to say he–I don't say he ever came down. I want to say he went right into the apartment across. He ran in there because somebody opened up the apartment and I told them to all get away and to say in their apartment. And at that point we just–I just said screw it. I put my gun away and then grabbed them and we started to pull them outside because they just–they–it just felt uncomfortable.

L.T. believed the child he saw went into the apartment across from Kaylie's. He also testified that he was not hit by gunfire, and suffered only a minor leg sprain after losing his footing on the stairs as the group fled.

{¶ 19} Jeffrey and Kaylie each testified that they heard nothing until the gunshots, and Jeffrey never noticed A.P. leaving Kaylie's apartment to go upstairs. Victoria testified that, just before the gunfire, she heard two knocks and A.P. saying, "I want to talk to the guy that was in my sister's apartment." Upon hearing gunshots, Jeffrey leapt from a window and ran to the back entrance and saw P.L. and C.B. lying on the ground, injured. His son, A.P., was on his back on the top landing. Jeffrey went to A.P. and tried

12.

dragging him to safety. Jeffrey looked toward appellant's apartment and saw someone smiling down at him.

{¶ 20} Police soon arrived, responding to 911 calls from the apartment complex regarding the shooting. Officers forced entry through the outer door of the building, and officers helped move A.P. outside the apartment building. Officer Donald O'Brien testified:

> When I approached there was two people on the ground. Looked like they had several gunshot wounds. I then went inside the building. There was – so I went up the steps. It was up on the landing between the floors, there was an individual laying on the floor who was [A.P.]. And then there was another man standing with him and that was his father. Um, so, at that time, I felt it's probably best let's grab him. I asked the father to help me. * * *
>
> So we pulled him outside, kind of dragging him. After that I ran to the firemen to signal them to move in, move my direction so we could start giving these guys some help.

O'Brien testified that, when he first encountered A.P., he did not notice a gun on him. After dragging him outside, they recovered a partially holstered gun from the entrance to the building, and O'Brien presumed the gun had fallen off as they dragged A.P. over the threshold.

13.

{¶ 21} When police arrived at appellant's door, they heard nothing inside and received no response to their calls through the door. An officer tried to kick in the door to gain entry, but metal framing on the door frustrated his efforts. Soon after, however, appellant calmly opened the door to police and surrendered. His gun, a .40 caliber, Smith & Wesson semiautomatic handgun, lay on the floor behind him, near the couch.

{¶ 22} Officers investigated the scene and recovered twelve shell casings, two from inside the apartment and ten from outside. Based on the locations of the shell casings, they determined appellant was inside his apartment when he began shooting, and moved outside to continue shooting as the men fled, with shots angled down the stairwell. Officers also recovered some of the bullets from the hallway and stairs and noted bullet defects, defined as the place where a bullet strikes a wall or object. Based on the scene, officers determined witness statements were consistent with the findings, or that appellant fired his weapon in a downward trajectory as the men fled down the stairs.

{¶ 23} Four of the six bullets recovered at the scene were tested and determined to come from the same firearm. Two bullets were too damaged to compare to appellant's gun. In addition to evidence of the shooting, the door to appellant's apartment had boot marks. Officers considered the marks consistent with an officer attempting to kick in the door, as viewed on body cam video.

{¶ 24} The coroner, Dr. Scala-Barnett, performed an autopsy on A.P. She determined A.P. had five gunshot wounds, including one shot to the back and likely fatal

14.

shots to the neck and groin. She further noted steep trajectories and a shored exit wound as to the neck and groin shots, indicating the shots could have been fired after A.P. was on the ground. Based on her examination, however, Dr. Scala-Barnett could not definitively state A.P.'s position when he was shot.

{¶ 25} Throughout the state's case, appellant attempted to demonstrate evidence of self-defense. Appellant elicited testimony on cross-examination to support his theory that A.P. and his friends came to the apartment building to start a confrontation. For example, C.B. testified that he believed someone was in Kaylie's apartment and they were going to get him out. C.B. also believed Kaylie had already called police on the intruder. Appellant also challenged the state's testimony that the only kicks to the door came from police, after the shooting, eliciting testimony from a detective that there were boot prints in more than one spot on the door, and Officer Revill, who was seen kicking the door on body cam video, had similar boots to those worn by A.P.

{¶ 26} In the defense case, appellant presented testimony to support his claim of self-defense. His mother, Teresa Watson, testified that she heard the argument between appellant and the women in the apartment across the hall, and sometime later, she heard the gunshots. Watson, however, did not hear anyone trying to kick in appellant's door prior to the gunshots.

{¶ 27} Watson testified that she looked out her door after hearing gunfire and she saw a man coming down the stairs with a bloody hand, holding a revolver. She testified

regarding a couple of unsuccessful phone calls, first to appellant and then to 911. After trying appellant's phone once more, she reached appellant, he answered the phone, and appellant asked Watson to send her husband up with more bullets. Watson did as appellant asked. When questioned by police at the scene, she did not identify herself as appellant's mother and police considered her just another building resident. Watson also did not disclose her phone call with appellant or his request for more bullets.

{¶ 28} Appellant testified on his own behalf. He characterized his initial encounter with Kaylie and Victoria as a discussion, and claimed Victoria was the aggressor, coming after him as he tried to go back upstairs. He denied he threatened the women with any harm. When the women came up to his apartment with Victoria's brother, Montrese, appellant claimed he had a civil conversation that ended with agreement to address future issues through the apartment manager, and he and Montrese shook hands. Appellant claimed Victoria did not let things end, though, and challenged appellant's girlfriend to a fight, requiring Montrese to restrain his sister and take her back downstairs.

{¶ 29} Appellant and his girlfriend returned inside to watch a movie. Appellant testified that he went to the kitchen to get a drink and saw five cars pulling into the parking lot through his kitchen window. He claimed five to ten men he did not recognize got out of the cars, and they "ran up to the building." He then heard someone ask,

"[T]his is apartment D, right?" He described the scene immediately prior to the shooting in the following exchange:

Q: And what happened next?

A: I heard footsteps running up the stairs.

Q: What happened?

A: And I heard kicking and knocking on the door.

Q: So what did you do?

A: I went to my bedroom in a closet and I grabbed my gun and put it in my pocket.

Q: So after doing that, what did you do?

A: I went and opened up the door.

Q: And what happened.

A: I seen the same five to ten males that I seen getting out of their cars running up to the building they were outside my door and the male closest to me, he said, who the fuck went downstairs and said something my sister?

Q: All right. And when that was said, what happened?

A: I responded and I told him it was me.

Q: So then what happened at this – well, let me back up. When you are at the door, where is [your girlfriend]?

A: I believe she – after she heard the kicking and knocking at the door, she went to her son room.

Q: So what happened after you said me?

A: The male closest to me, he lifted up his shirt and was reaching for his firearm with his other hand.

Q: Now, did you see the firearm?

A: Yes.

Q: All right. And where was this firearm?

A: In his waistband where he was reaching.

Q: All right. And what did you do?

A: I pulled my gun out and I started to fire.

{¶ 30} Appellant testified he fired his gun ten to twelve times, believing all the men had guns and fearing he would be shot or killed. He testified he saw A.P. reach for a gun and he saw another of the men pull his gun out, and he "just fired to get them away from me and away from [my girlfriend and her son]." He tried to close his apartment door but testified A.P. had fallen with his foot over the threshold, preventing the door from closing. Once he was able to close the door, he testified he tried to call 911, but was not successful. He then got a call from his mother.

{¶ 31} According to appellant, Watson called to check on him and he told her he was fine. But he also asked her to send his stepfather upstairs with more bullets. When

18.

asked why he needed more bullets, appellant stated, "Because I was out and I feared that the other males would come back up there for the male that was out there in the hallway in front of my door." Appellant's stepfather brought the bullets up, and appellant opened the door to take them. He saw "a male cradling the other individual that was laying in the hallway." Appellant later identified the man as A.P.'s father, Jeffrey, and he denied smiling at him, as Jeffrey testified earlier.

{¶ 32} Appellant next claimed he tried calling 911 once more, without success. Then he went to check on his girlfriend and her son, but did not find them in the bedroom. He believed they were hiding under the bed, but as he looked, he was drawn back to the apartment door by "more kicks and knocks at the door." He asked who was at the door, and they identified themselves as Toledo Police. Appellant testified the gun was still in his hand, so he put the gun by the couch and opened the door to the police. Appellant complied with the police orders to step back, lay on his stomach, and place his hands behind his back, and police took him into custody. They retrieved his gun, which was not loaded, and secured the rest of the apartment before taking appellant away.

{¶ 33} On cross-examination, appellant admitted that A.P. did not come into his apartment, and none of A.P.'s friends came into his apartment. Furthermore, while appellant claimed one of the men was trying to kick in his door, he testified he opened his door to A.P. with the hope of having a friendly conversation. Appellant also acknowledged that A.P. and his companions were not screaming or yelling, as "there was

no words being said before I opened the door." Finally, appellant acknowledged that none of the men had a weapon in their hand when he opened the door.

{¶ 34} Appellant claimed that his gun was in his pocket and, as A.P. simultaneously reached for his weapon and started to come towards the apartment, appellant was the quickest in drawing a weapon. Appellant admitted that he never told police that A.P. "was reaching for his gun and walking or approaching" the apartment door, but claimed he either told police A.P. had a gun or that A.P. was reaching for a gun.

{¶ 35} As to the continued shooting, appellant admitted he stepped over A.P.'s body and continued firing at the other men as they were fleeing, firing in a downward trajectory on the stairs, and none of the men returned fire. He also acknowledged that some of his bullets went through both P.L. and C.B., but denied the men were trapped on the staircase "like fish in a barrel." Appellant also had no explanation for the downward trajectory of both fatal wounds to A.P., to the neck and groin, or the fact that A.P. had been shot in the back, with all shots at close range.

{¶ 36} After the defense rested, the state presented rebuttal testimony to address the testimony of appellant and his mother.

{¶ 37} Detective Jeffrey Sharp testified that he interviewed Watson after the shooting, and she never disclosed her relationship to appellant. He testified that Watson also did not inform him of the individual she saw on the stairs or provide details she included in her later statements and testimony, that she tried to call 911 or she talked to

20.

appellant on the phone and sent him more bullets. Sharp indicated that Watson did give a description of a tall, dark-haired man running in the parking lot, away from the apartment building. As a result of Watson's limited answers, however, police did not seek to verify whether any 911 calls were attempted from Watson's phone, and did not explore the identity of an armed man, descending the stairs. Detective Sharp acknowledged, on cross-examination, that he never asked Watson for any of the information withheld, and the information Watson did provide was apparently correct, if incomplete.

{¶ 38} Detective Paul Marchyok also testified as a rebuttal witness. He indicated he investigated the claims by Watson and appellant that they had tried calling 911, and determined that Watson never attempted to call. He further determined that appellant called after the shooting, but hung up, with his call logged in a minute after the first 911 call was received to report the shooting. The 911 operator called appellant back, but appellant did not answer or try to call 911 again. Finally, Detective Marchyok reviewed body cam footage of police taking appellant into custody, and he testified that appellant made no statement that A.P. "was in the process of reaching for his gun" when appellant shot him. Instead, the detective noted that appellant told Officer Revill that he saw a gun "as a male tried to come into the apartment."

{¶ 39} Following the state's rebuttal case, the trial court instructed the jury and included an instruction regarding self-defense. As part of the instruction, the trial court explained that appellant had no duty to retreat before acting in self-defense of his

21.

residence. The trial court also instructed that "resort to deadly force is not justified by abusive language, verbal threats or other words, no matter how provocative." The trial court then instructed on the proportionality of the force used in self-defense, as follows:

> A person is allowed to use force that is reasonably necessary under the circumstances to protect himself or his residence from an apparent danger. For you to find the defendant guilty, the State must prove beyond a reasonable doubt that the defendant used more force than reasonably necessary and that the force used was greatly disproportionate to the apparent danger.

After the trial court completed its jury instructions, the state and defense gave their closing arguments.

{¶ 40} The state argued that the privilege to use self-defense to defend your residence did not apply because the evidence demonstrated that none of the men broke into or were in the process of breaking into appellant's home. The state argued that it had demonstrated, by a preponderance of the evidence, that the men knocked on appellant's door, a request for permission to enter or interact with the homeowner, and none of the men were in the process of breaking in to appellant's home.

{¶ 41} The state then argued that they had demonstrated, beyond a reasonable doubt, that appellant was not entitled to claim self-defense. The state argued appellant was at fault in creating the dispute that led to the men to his door. Next, the state argued

22.

that appellant did not have reasonable grounds to believe he was in imminent danger of death or great bodily harm, evidenced by the fact he opened the door to the men. The state further argued that appellant used unreasonable force. The state pointed out that – by appellant's own admission–none of the men returned fire yet he stepped over A.P.'s body and continued firing at the rest of the group as they fled down the stairs.

{¶ 42} Appellant's trial counsel argued that he did act in self-defense, and the single issue for the jury to resolve was whether the state proved beyond a reasonable doubt that appellant did not act in self-defense. Trial counsel characterized the shooting as "nothing more than a calamity brought about [by] a great deal of misinformation." Counsel pointed to the mistaken belief that A.P. and his father were responding to reports that someone had broken into Kaylie's apartment and threatened to kill the people in the apartment. Trial counsel further argued that the testimony of Jeffrey and the men who accompanied A.P. to the apartment regarding their intentions was not believable, considering some of the men had guns or knives and they were part of a club called, "Brothers of Vengeance." Counsel also pointed out the overlaid boot prints on appellant's door, and the likelihood that A.P. also kicked the door considering his boots had a similar tread to those of the police officer seen on video, attempting to kick the door in. In all, trial counsel argued that appellant, in the moment, had a reasonable belief that he was in imminent danger, and acted appropriately to defend himself and his residence.

23.

{¶ 43} After deliberating, the jury returned a not guilty verdict on Count 1, murder in violation of R.C. 2903.02(A) (purposeful murder) and Count 7, felonious assault in violation of R.C. 2903.11(A)(2) and (D) (as to L.T.).

{¶ 44} The jury returned a guilty verdict on Count 2, murder in violation of R.C. 2903.02(B) and 2929.02 [felony murder], guilty on Counts 3, 4, 5, and 6, felonious assault in violation of R.C. 2903.11(A)(2) and (D) as to A.P. (Count 3); C.B. (Count 4); P.L. (Count 5); and E.W. (Count 6). The jury further found each of the attached firearm specifications pursuant to R.C. 2941.145 applied as to Counts 2-6.

{¶ 45} On July 27, 2022, the trial court held a sentencing hearing. The trial court found that Counts 2 and 3 merged pursuant to R.C. 2941.25, and the state elected to proceed to sentencing as to Count 2. Appellant was sentenced to 15 years to life in prison as to Count 2, with 15 years mandatory. The trial court sentenced appellant to serve an indefinite prison term of 7 years to 10-and-a-half years as to each of Counts 4 (C.W.), 5 (P.L.), and 6 (E.W.), and ordered the sentences to run concurrently. The trial court further imposed a mandatory and consecutive prison term of three years for the firearm specification attached to Counts 2 and 4, and elected not to impose any additional prison term for the remaining specifications attached to Counts 5 and 6. In total, appellant received an aggregate prison term of 21 years to life.

{¶ 46} This appeal followed.

24.

## II.    Assignments of Error

{¶ 47} Appellant asserts a single assignment of error on appeal:

The State of Ohio did not prove beyond a reasonable doubt that Appellant did not act in self-defense, such that his convictions for felony murder and felonious assault were against the manifest weight of the evidence.

## III.    Analysis

{¶ 48} Appellant was convicted of one count of felony murder and three counts of felonious assault, with additional findings for firearm specifications as to each count. At trial, appellant asserted the affirmative defense of self-defense. Pursuant to R.C. 2901.05(A), the state had the burden of proof as to all elements of the offenses beyond a reasonable doubt. With the amendment to R.C. 2901.05, effective March 28, 2019, the state also had the burden of proving the lack of self-defense beyond a reasonable doubt. *State v. Messenger,* Slip Opinion 2022-Ohio-4562, ¶ 15, citing R.C. 2901.05(B)(1); *see also State v. Greer,* 6th Dist. Lucas No. L-22-1082, 2023-Ohio-103, ¶ 34. "The state's new burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal[.]" *Messenger* at ¶ 27.

{¶ 49} The weight of the evidence concerns the burden of persuasion, or whether the greater amount of credible evidence supports the verdict. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "When a court of appeals reverses a

25.

judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida,* 457 U.S.31, 45, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). In applying the manifest-weight standard, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury lost its way in resolving conflicts in the evidence, resulting in a manifest miscarriage of justice that necessitates a new trial. (Citations omitted) *Thompkins* at 387. In considering manifest-weight review, we note that reversal is appropriate "only in the exceptional case in which the evidence weighs heavily against conviction." *State v. Lindsey,* 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000), citing *Thompkins* at 387 (additional citation omitted.).

{¶ 50} We focus on the evidence, deferring to the jury's credibility determinations and whether the weight of the evidence supports the verdicts.

When we consider witness credibility, we must remember "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). The jury is "in the best position to observe the evidence presented, the witnesses' testimony, including their demeanor, voice inflection, and mannerisms, in order to determine the credibility of each witness." *State v.*

26.

*Saunders*, 10th Dist. Franklin No. 99AP-1486, 2000 WL 1724823, *3

(Nov. 21, 2000).

*State v. Allen*, 6th Dist. Lucas No. L-18-1191, 2020-Ohio-4493, ¶ 91.

{¶ 51} In this case, the trial court provided the jury with instruction regarding self-defense as to each offense. Therefore, appellant presumably met his burden of producing sufficient evidence that tended to support his claim of self-defense. *See* R.C. 2901.05(B)(1); *Messenger* at ¶ 26. Only after a defendant meets this burden does the burden shift to the state, and the state must demonstrate the defendant *did not* act in self-defense beyond a reasonable doubt. *Messenger* at ¶ 19-20; R.C. 2901.05(B)(1). The state satisfies this burden if it disproves "at least one of the elements of self-defense beyond a reasonable doubt." *State v. Carney,* 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31.

{¶ 52} With the amendment to R.C. 2901.05(B), the state must now disprove any of the following elements of self-defense, beyond a reasonable doubt: (1) Appellant was not at fault in creating the situation giving rise to the affray, (2) Appellant had a bona fide, or reasonable and honest belief, that he was in imminent danger of death or great bodily harm and his only means of escape was to use such force; or (3) Appellant did not violate any duty to retreat or avoid the danger. *Messenger* at ¶ 14, citing *State v. Barnes,* 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 92002). Furthermore, recent amendment of R.C. 2901.09(B), limits the duty to retreat before using self-defense in most cases, providing

27.

that "a person has no duty to retreat before using self-defense * * * if that person is in a place which the person lawfully has a right to be." *State v. Lane,* 6th Dist. Erie No. E-22-035, 2023-Ohio-1305, ¶15, quoting R.C. 2901.09(B).

{¶ 53} Appellant argues the greater weight of the evidence supported finding he acted in self-defense, focusing on his testimony and scuff marks demonstrating A.P. and/or his companions kicked his door, and his testimony that A.P. reached for a gun. Appellant argues he was not at fault in creating the affray because the dispute had ended by the time A.P. and his companions came to his door, characterizing A.P.'s arrival and the kicks to the door as the beginning of a new dispute. He further argues that he had a bona fide belief he was in imminent danger, again based on A.P. and/or his companions kicking his door, which prompted appellant to retrieve his gun. Finally, appellant argues he had no duty to retreat because he was in a place he was legally entitled to be.

{¶ 54} Focusing on the bona fide belief element, we note that "[c]ourts recognize that this is a combined subjective and objective test." *Lane* at ¶ 24, citing *State v. Thomas,* 77 Ohio St.3d 323, 330, 673 N.E.2d 1339 (1997). A bona fide belief requires weighing the use of force against the believed danger, permitting "only such force as is necessary to repel an attack." *Lane* at ¶ 24, citing *State v. Barker,* 2d Dist. No. 29227, 2022-Ohio-3756, 199 N.E.3d 626, ¶ 28, *appeal not allowed,* 169 Ohio St.3d 1431, 2023-Ohio-281, 202 N.E.3d 721.

28.

{¶ 55} In this case, appellant's bona fide belief greatly depended on the jury believing his testimony of an angry, armed mob, trying to kick down his door, over the state's witnesses, who uniformly testified there was no kicking or aggressive movement, and that none of the men displayed any weapons as a threat in approaching the door. Appellant relies on inconsistencies in the evidence to support his position, but as previously addressed, our review is limited to determining whether, in resolving these inconsistencies, the jury clearly lost its way. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. Thus, based on the evidence presented, the jury could have credited the victim's testimony over appellant's, and determined that appellant *did not* have a bona fide belief that he was in imminent danger of great bodily harm.

{¶ 56} In crediting the victim's testimony, appellant's use of force was disproportionate to any danger posed by A.P. and his companions. Where "the force used was so disproportionate that it shows a purpose to injure, self-defense is unavailable." *State v. Barker,* 2022-Ohio-3756, 199 N.E.3d 626 (2d Dist.), ¶ 28, citing *State v. Wallace-Lee,* 2d Dist. Greene No. 2019-CA-19, 2020-Ohio-3681, ¶ 43, quoting *State v. Macklin,* 8th Dist. Cuyahoga No. 94482, 2011-Ohio-87, ¶ 27. Considering the record, including that appellant stepped over A.P.'s body and continued shooting at the other men as they fled, firing down into the stairwell, we do not find the jury lost its way in finding the state proved, beyond a reasonable doubt, that appellant did not use self-defense in killing A.P. and injuring P.L., C.B., and E.W. Because the state need only

disprove one of the elements of self-defense beyond a reasonable doubt, *see Carney,* 2020-Ohio-2691 at ¶ 31, we need not address additional elements, as this one element is dispositive in this case.

{¶ 57} Accordingly, upon careful review of the record, we find no error based on the manifest weight of the evidence regarding the lack of self-defense in this case. We find appellant's sole assignment of error not well-taken.

### IV.    Conclusion

{¶ 58} Based on the foregoing, we affirm the judgment of the Lucas County Court of Common pleas. Appellant is ordered to pay the costs of the appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                          _____
                                                              JUDGE
Gene A. Zmuda, J.

                                                   _____
Charles E. Sulek, J.                                      JUDGE
CONCUR.

                                                   _____
                                                              JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.