[Cite as *State v. Fisher*, 2024-Ohio-5520.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                        Court of Appeals No.  L-23-173

　　　　Appellee                                  Trial Court No.  CR0202102870

v.

　Rasheed Fisher                                **DECISION AND JUDGMENT**

　　　　Appellant                                Decided:  November 22, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**ZMUDA, J.**

**{¶ 1}** Appellant, Rasheed Fisher, appeals the judgment of the Lucas County Court

of Common Pleas, sentencing him to an aggregate prison term of 33 years to life for

aggravated murder in violation of R.C. 2903.01(B), an unclassified felony, with a firearm

specification pursuant to R.C. 2941.145. Finding no error, we affirm.

## I. Introduction

{¶ 2} This matter arose from a shooting in Toledo, Ohio, on November 3, 2021, with no dispute that the appellant, Rasheed Fisher, shot and killed the victim, R.K., who went by the nickname "Dougie." There is also no dispute that Dougie had a new firearm, a camouflage burgundy and black handgun, and he showed it to some of the people at a bonfire, hosted in the yard of appellant's father.

{¶ 3} Appellant and Dougie were both at the bonfire and were friends. On the night of the bonfire, however, appellant and Dougie had an unfriendly encounter and appellant told Dougie to leave. When Dougie did not leave, appellant had words with Dougie and then shot him. Witnesses then observed appellant removing Dougie's gun from his pants. Dougie was transported to the hospital but succumbed to his injuries.

{¶ 4} Police responded to 911 calls, reporting the shooting, and several witnesses were transported downtown for interviews. Police interviewed W.S., appellant's father, and W.S. phoned appellant during his interview, to secure appellant's safe surrender. W.S. did not convince appellant to turn himself in. Police also interviewed N.D., a family friend, and M.T., the mother of Dougie's children.

{¶ 5} Six days later, appellant turned himself in. Appellant did not produce the gun he used to shoot Dougie, and Dougie's gun was never recovered.

{¶ 6} On November 18, 2021, the state indicted appellant on one count of aggravated murder in violation of R.C. 2903.01(B) and (G), with a firearm specification pursuant to R.C. 2941.145(A), (B), (C), and (F); one count of murder in violation of R.C.

2

2903.02(A) and 2929.02, with a firearm specification pursuant to R.C. 2941.145(A), (B), (C),and (F), and one count of grand theft in violation of R.C. 2913.02(A)(1) and (B)(4), with a firearm specification pursuant to R.C. 2941.141(A),(B),(C), and (F). Appellant was arraigned on December 14, 2021, and entered a not guilty plea to the charges.

{¶ 7} The trial court granted appellant's motion for funds for an investigator, and the matter proceeded through discovery. On October 31, 2022, appellant's trial counsel filed a motion to withdraw, citing unwaivable conflict. The trial court granted the motion to withdraw on November 15, 2022, and new counsel entered an appearance for appellant. On March 3, 2023, appellant, through trial counsel, filed a notice of self-defense.

{¶ 8} On June 26, 2023, the matter proceeded to a jury trial. In addition to the investigators and police, the state called N.D. and M.T. as witnesses, as well as a neighbor from across the street who had been at the bonfire but was inside her home at the time of the shooting. Both N.D. and M.T. testified that Dougie did not have the gun in his hand at the time of the shooting.

{¶ 9} N.D. testified that Dougie came to the bonfire, showed off his new gun, then tucked it inside his waistband. N.D. testified that he overheard appellant ask Dougie for his gun, and when he turned to tell them to take their argument away from his parked car, he saw appellant shoot Dougie. N.D. testified that he yelled at appellant, saying "we don't do this," and appellant looked at N.D., then turned back toward Dougie and

3

"emptied the clip on him." N.D. testified that appellant started to run off, stopped and came back, went in Dougie's pants, and then took off with Dougie's gun.

{¶ 10} After the shooting, N.D. testified that he did not see appellant again, but did see appellant's father, W.S. N.D. stated that he and W.S. stopped spending time together after they disagreed about appellant's pending case. N.D. testified, "I wouldn't agree with what he wanted me to agree with and he got upset and after that we just decided to leave each other alone."

{¶ 11} M.T. testified that Dougie and appellant were friends, and Dougie considered appellant to be a brother. M.T. lived about 3 or 4 houses away, and she walked to the gathering. As she and Dougie were drinking by the fire, appellant pulled up in his blue van. M.T. testified that appellant and Dougie got along for about 25 minutes, but then got into an argument. M.T. heard appellant tell Dougie to "get the 'F' away from down here on north" and, at first, Dougie thought appellant was joking with him. Appellant went to the side of his father's house, then returned and seemed angrier. Appellant again told Dougie to "get the 'F' away" and M.T. grabbed Dougie's arm to pull him away from the bonfire. She heard gunfire and ran as Dougie was hit. M.T. testified she saw appellant go into Dougie's pocket and take his gun.

{¶ 12} M.T. acknowledged calling 911 and admitted she told the 911 operator that she did not know who shot Dougie, indicating she was afraid of what appellant or his father would do to her if they heard her accuse appellant. M.T. testified that a few days later, appellant drove by her house in his blue van, wearing a black ski mask and making

4

a shooting motion at her out his window as he drove by. M.T. felt appellant was threatening her, and she moved shortly after. At the time of trial, M.T. testified she had moved again.

{¶ 13} The neighbor, J.J., testified regarding the scene at the bonfire, stating she and N.D. listened to music and enjoyed a drink by the fire earlier in the evening. J.J. testified that she left after appellant changed the music, which resulted in a change in the atmosphere of the gathering. At the time J.J. left, Dougie had not arrived at the party. After J.J. heard gunshots, she came outside and saw Dougie lying on the ground, with W.S., N.D., and Dougie's girlfriend, M.T., standing around him. J.J. called 911 as she crossed the street to W.S.'s house.

{¶ 14} In addition to the eyewitness testimony, the state presented the 911 calls and testimony of the officers and coroner. In the recording of M.T.'s 911 call, M.T. tells the operator that she did not witness the shooting and did not know who shot Dougie. The autopsy indicated the gunshots caused Dougie's death, and at the time of death, Dougie had a blood alcohol level of .07, with evidence of marijuana use but no active metabolites in his blood at the time of death.

{¶ 15} At the close of the state's case, appellant moved for acquittal pursuant to Crim.R. 29. The trial court denied the motion.

{¶ 16} Appellant's father, W.S., testified on his behalf. W.S. testified that Dougie showed up to the house with a gun, and W.S. told him not to bring guns to his house. W.S. also testified that appellant had taken M.T. to the grocery store earlier in the day

and was sitting by the bonfire with M.T. when Dougie arrived. W.S. indicated Dougie started trouble with appellant, accusing appellant of sleeping with M.T. W.S. also testified that, after appellant went inside the house, Dougie talked about beating appellant. When appellant came back outside, Dougie had the gun in his hand again. W.S. indicated Dougie had been drinking and "had a whole gallon of Evian, clear."

{¶ 17} W.S. testified that Dougie and appellant got "back to arguing and tussling over the gun." He could hear the argument but could not tell what the two were saying, but W.S. indicated Dougie's gun was in his hand the entire time. W.S. stated he did not see the shooting, but heard the gun shot from his position at the side of the house. By the time he came out from between the houses, "everything was over," and he saw appellant running away. Later, at the police station, W.S. called appellant to convince him to turn himself in.

{¶ 18} W.S. acknowledged that his testimony was much more detailed than the statement he gave police the night of the shooting, and included information never shared with police or the prosecutor he met, a year prior to trial. W.S. insisted, however, that the police and prosecutor never asked for the details, and he shared those details with appellant's first trial counsel. The testimony of W.S. also contradicted earlier witnesses. W.S. testified that Dougie's arrival caused J.J. to leave the bonfire, contrary to J.J.'s testimony that she left before Dougie arrived. W.S. also questioned N.D.'s recollection of events, stating N.D. did not see well, stating, "It dark and he got to wear glasses ever time he reads, he like this here (gesturing)." Furthermore, while W.S. testified that Dougie

6

threatened appellant, he admitted that he told police that Dougie probably threatened appellant, but he did not know what was said because the music was loud. W.S. admitted he was drunk that night, and therefore could not recall details of what he perceived as a tussle over two guns.

{¶ 19} Appellant testified on his own behalf. Appellant testified that he went to W.S.'s house around 7:30 p.m., before Dougie arrived. He testified that Dougie walked up to the bonfire from M.T.'s house with a "bottle in one hand and gun in the other." Appellant stated that Dougie was waving the gun around and asked if appellant was sleeping with M.T. Appellant indicated that Dougie walked up to him as he sat by the fire, and appellant denied that anyone was sleeping with M.T. Appellant walked away toward W.S., at the side of the house, and he told W.S. they needed to diffuse the situation with Dougie.

{¶ 20} When appellant returned to the front yard, Dougie again questioned whether appellant was sleeping with M.T. Appellant testified that he asked Dougie to leave. Appellant testified that Dougie refused to leave and raised his weapon at appellant, and appellant feared that Dougie was "ready to kill me." Appellant's testimony placed both M.T. and W.S. near this confrontation, and appellant had no explanation for their contrary testimony, stating M.T. and W.S. did not tell the truth in their testimony. Appellant also did not recall a tussle over a gun, as recounted by W.S., and instead, Appellant testified that Dougie approached him, pointing his gun, and told appellant, "I'll make you leave before I leave." Appellant indicated he "acted quick," pulled his gun

7

from his pocket, shot three times, and Dougie dropped. Appellant then disarmed Dougie "because I was afraid of being shot." Then, appellant testified, he left in his van.

{¶ 21} Appellant could not recall any details regarding where he went after the shooting or what happened to the two guns. Appellant did recall the phone call with W.S. about turning himself in, and insisted he did so, albeit a week later. When questioned about why he delayed a week before turning himself in, appellant testified he was getting his affairs in order and speaking to his attorney. Appellant also acknowledged that W.S. and others gave statements to his attorney in the time before he turned himself in.

{¶ 22} Following appellant's testimony, the defense rested, and appellant renewed his motion for acquittal. The trial court denied the motion.

{¶ 23} The state called no rebuttal witness, and the trial court proceeded to jury instructions. Over the objection of the defense, the trial court instructed the jury regarding flight and consciousness of guilt. The trial court also gave the self-defense instruction.

{¶ 24} After deliberations, the jury returned a guilty verdict on all charges, and entered the further finding that appellant used a deadly weapon as to each of the firearm specifications.

{¶ 25} On July 13, 2023, the trial court held a sentencing hearing. The trial court determined that the three charges were allied offenses of similar import and subject to merger, and the state elected to proceed to sentencing on aggravated murder with the attached firearm specification. The trial court imposed a prison sentence of life with the possibility of parole after 30 years, with a mandatory and consecutive term of three years

8

for the attendant firearm specification, for an aggregate prison term of life with the possibility of parole after 33 years.

{¶ 26} This appeal followed.

## II. Assignments of Error

{¶ 27} Appellant asserts the following assignments of error on appeal:

1. The State of Ohio did not prove beyond a reasonable doubt that Appellant did not act in self-defense, such that his convictions for aggravated murder, murder, and aggravated robbery were against the manifest weight of the evidence.

2. In the alternative, the court abused its discretion when it denied Appellant's motion for acquittal pursuant to Crim.R. 29, due to insufficient evidence of guilt having been submitted to the jury.

## III. Analysis

{¶ 28} Appellant challenges his conviction, arguing the jury's finding that he did not act in self-defense is against the manifest weight of the evidence, and alternatively, that the state failed to present sufficient evidence to support conviction. We address each argument in turn.

### A. The manifest weight of the evidence supported the jury's finding that appellant did not act in self-defense.

{¶ 29} In his first assignment of error, appellant argues that the weight of the evidence did not demonstrate, beyond a reasonable doubt, that appellant did not act in self-defense. Appellant does not otherwise challenge the elements of the offenses for

which the jury returned a guilty verdict. Instead, appellant argues his version of the facts, focusing on the fact that Dougie brought a gun to the bonfire. Appellant discounts the testimony of the state's witnesses who stated Dougie's gun was tucked in his waistband when appellant shot and killed him and appellant does not otherwise address his own testimony, acknowledging he shot Dougie and then took both guns as he fled the scene, professing no knowledge of what happened to the guns in the week before he turned himself in to police.

{¶ 30} The weight of the evidence concerns the burden of persuasion, or whether the greater amount of credible evidence supports the verdict. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida,* 457 U.S.31, 45 (1982).

{¶ 31} In applying the manifest-weight standard, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury lost its way in resolving conflicts in the evidence, resulting in a manifest miscarriage of justice that necessitates a new trial. (Citations omitted) *Thompkins* at 387. In considering manifest-weight review, we note that reversal is appropriate "only in the exceptional case in which the evidence weighs heavily against conviction." *State v. Lindsey,* 87 Ohio St.3d 479, 483 (2000), citing *Thompkins* at 387 (additional citation omitted.).

10

**{¶ 32}** In this case, appellant asserted the affirmative defense of self-defense as to each charge: aggravated murder, murder, and grand theft. To succeed on a claim of self-defense by means of deadly force, the evidence must demonstrate: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger. *State v. Howard,* 2024-Ohio-2490, ¶ 17 (6th Dist.), citing *State v. Wilson*, 2024-Ohio-776, ¶ 20, citing *State v. Messenger*, 2022-Ohio-4562. (Additional citation omitted.) The parties concede that appellant presented a prima facie case of self-defense, and therefore, the burden of proof shifted to the state to overcome appellant's evidence of self-defense. The state, accordingly, bore the burden of demonstrating that appellant did not act in self-defense, beyond a reasonable doubt. *Messenger* at ¶ 26.

**{¶ 33}** In challenging the conviction, appellant argues the conflicting evidence weighed in favor of finding he acted in self-defense, contrasting his evidence, W.S.'s testimony and his own, against the state's evidence. The state's witnesses identified appellant as angry and shooting a gun. The state's witnesses also indicated Dougie's gun remained tucked in his waistband at the time of the shooting. Appellant ignores the conflicting evidence demonstrating no gun in Dougie's hand, focusing instead on the source of the conflict between appellant and Dougie. Appellant argues that "[t]his court should find that this case arguably turns on the fact that the victim brought a firearm to a

11

neighborhood gathering, arguably based on a mistaken belief that [appellant] had cause[d] him a personal affront by sleeping with [M.T.]." Based on appellant's testimony that Dougie threatened him with a gun, appellant argues that the jury lost its way in not finding that appellant used proper force to defend himself.

{¶ 34} To negate appellant's claim of self-defense, the state needed to disprove any of the elements of self-defense, beyond a reasonable doubt. *Messenger* at ¶ 14, citing *State v. Barnes,* 94 Ohio St.3d 21, 24 (2002). The state concedes that appellant did not violate any duty to retreat, a limited duty in that "a person has no duty to retreat before using self-defense * * * if that person is in a place which the person lawfully has a right to be." *State v. Lane,* 2023-Ohio-1305, ¶15 (6th Dist.), quoting R.C. 2901.09(B). The state argues that the evidence demonstrated that appellant was at fault in creating the situation, that appellant did not have a reasonable belief of imminent danger, and that appellant's use of deadly force was unreasonable considering the circumstances.

{¶ 35} Appellant relies on the circumstances earlier in the evening in arguing self-defense. He argues that testimony regarding "the location of the gun in the victim's possession verses the location of the gun in appellant's possession at the time of the shooting" should not be the focus. Instead, appellant contends, we should consider that Dougie "appeared to be preparing for an altercation by carrying a firearm, knowing that [appellant] would be there, and believing, mistakenly, that [appellant] had been sleeping with the mother of his children." Therefore, appellant argues, Dougie was the initial aggressor, and appellant was in imminent fear of being killed by Dougie.

12

{¶ 36} Appellant's argument rests heavily on his own interpretation of the testimony, discounting the fact that the state's witnesses testified that Dougie's gun remained in his waistband at the time of the shooting. To demonstrate appellant did not act in self-defense, the state only needed to disprove one element of self-defense, beyond a reasonable doubt. *Messenger* at ¶ 14, citing *Barnes,* 94 Ohio St.3d at 24. Therefore, even if the jury believed appellant's testimony regarding an aggressive Dougie, accusing appellant of sleeping with M.T., the evidence of appellant's bona fide belief depended on the jury disbelieving the state's witnesses who testified that Dougie never drew his gun to threaten appellant.

{¶ 37} The bona fide belief element of self-defense "is a combined subjective and objective test." *State v. Woods,* 2023-Ohio-3549, ¶ 54 (6th Dist.), quoting *Lane,* 2023-Ohio-1305, ¶ 24, citing *State v. Thomas,* 77 Ohio St.3d 323, 330 (1997). "A bona fide belief requires weighing the use of force against the believed danger, permitting 'only such force as is necessary to repel an attack.'" *Woods* at ¶ 54, quoting *Lane* at ¶ 24, citing *State v. Barker,* 2022-Ohio-3756, ¶ 28 (2d Dist.). Furthermore, where the use of force "was so disproportionate that it shows a purpose to injure, self-defense is unavailable." *Woods* at ¶ 56, quoting *Barker* at ¶ 28 (additional citations omitted.).

{¶ 38} The evidence in this case included testimony that appellant shot Dougie, continued to shoot Dougie after he fell, started to flee, and then returned to Dougie and removed the gun from Dougie's waistband before driving away in his van. The record also demonstrated that, despite his father's urging to turn himself in, appellant waited a

13

week to go to police and could not explain what happened to either his gun or Dougie's gun. Finally, while appellant's father testified regarding a struggle, he also admitted he did not see the shooting but came outside of the house after hearing the shots. Considering the record, therefore, we do not find that the jury clearly lost its way in finding the state disproved self-defense beyond a reasonable doubt. Additionally, because the state need only disprove one element of self-defense, we need not address additional elements. *See State v. Carney,* 2020-Ohio-2691, ¶ 31 (10th Dist.).

{¶ 39} Accordingly, upon careful review of the record, we find no error based on the manifest weight of the evidence regarding the lack of self-defense in this case. We find appellant's first assignment of error not well-taken.

### B. The state presented sufficient evidence of guilt to sustain the conviction.

{¶ 40} In his second assignment of error, appellant argues that the trial court abused its discretion in denying his motion for acquittal pursuant to Crim.R. 29. In challenging the sufficiency of the evidence to support conviction, however, appellant mainly disputes the credibility of the witness testimony as "highly disparate" and fails to address the fact that he asserted an affirmative defense to the charged offenses.

{¶ 41} A challenge based on the sufficiency of the evidence concerns "[w]hether the evidence is legally sufficient to sustain a verdict," and presents a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386-387 (1997). Sufficiency is a test of adequacy, or whether, after considering the evidence most favorably for the prosecution, a rational trier of fact could have found that the state proved all essential elements of an offense

14

beyond a reasonable doubt. *State v. Harris,* 2024-Ohio-4722, ¶ 15 (6th Dist.), quoting *State v. Smith,* 80 Ohio St.3d 89, 113 (1987); *see also Thompkins* at 386.

{¶ 42} The jury found appellant guilty on all charges, aggravated murder, murder, and grand theft, each with a firearm specification. As to proof of the elements of these offenses, appellant pursued the affirmative defense of self-defense, and therefore, appellant admitted doing the acts the state alleged in the indictment by asserting self-defense, a defense of avoidance or legal justification for doing those acts. *State v. Bulger,* 2023-Ohio-4004, ¶ 16, (6th Dist.); *see also State v. Alley,* 2024-Ohio-115, ¶ 23 (6th Dist.). Essentially, the defense of self-defense is one that does not negate the state's case, but instead presumes the state has established a prima facie case but nevertheless defeats the charge based on a legal avoidance of the charge. (Citations omitted) *State ex rel. Parker Bey v. Bureau of Sentence Computation,* 2022-Ohio-236, ¶ 18.

{¶ 43} Additionally, the state presented witness testimony demonstrating appellant shot and killed Dougie then took Dougie's gun from his pants before fleeing the scene. Appellant also testified at trial and admitted shooting Dougie and then taking Dougie's gun. The only issue in dispute at trial concerned appellant's justification for these actions, or whether the state sustained its burden to disprove appellant's claim of self-defense. Because appellant claimed self-defense, moreover, we review the sufficiency of the evidence as it relates to his prima facie claim of self-defense, with manifest weight review appropriate for examining the state's evidence in rebuttal of the claim of self-defense. *State v. Bonner,* 2023-Ohio-4003, ¶ 95 (6th Dist.), quoting *State v. Messenger,*

15

2022-Ohio-4562, ¶ 26; *see also Toledo v. Duckworth,* 2023-Ohio-1412, ¶ 13 (6th Dist.).

Thus, appellant's challenge to the state's case, based on sufficiency, lacks merit.

**{¶ 44}** We find appellant's second assignment of error not well-taken.

### IV. Conclusion

**{¶ 45}** Based on the foregoing, we affirm the judgment of the Lucas County Court of Common pleas. Appellant is ordered to pay the costs of the appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

_____
JUDGE

Gene A. Zmuda, J.

_____

Charles E. Sulek, P.J.
CONCUR.

JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.