[Cite as *State v. Walker*, 2024-Ohio-5531.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-22-1232

    Appellee                              Trial Court No.  CR0202102152

v.

Feymon Walker                            **DECISION AND JUDGMENT**

    Appellant                             Decided:  November 22, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant, Feymon Walker, appeals the September 1, 2022 judgment of the

Lucas County Court of Common Pleas, following a jury trial convicting him of one count

of murder, one count of felonious assault, both with firearm specifications, and one count

of tampering with evidence.  Because the properly selected and instructed jury did not

lose its way when it rejected Walker's self-defense claim, the trial court's judgment is

affirmed.

## I. Facts and Procedural Background

{¶ 2} After midnight on July 18, 2021, Walker and the victim, S.C., encountered each other in downtown Toledo, Ohio, and fought - both verbally and physically. Walker pulled out a gun and shot S.C. twice; S.C. died at the scene. Walker fled the scene, hid his gun, entered a nearby bar where he threw away his hat and shirt, and put on a new shirt and a pair of glasses. The police arrested Walker at the bar.

{¶ 3} On July 27, 2021, the Lucas County Grand Jury indicted Walker on one count each of murder, a first-degree felony, felonious assault, a second-degree felony, both with firearm specifications, and tampering with evidence, a third-degree felony. Walker pleaded not guilty to the charges. He later indicated that he would be presenting a self-defense claim.

{¶ 4} On August 9, 2022, Walker's jury trial commenced. At trial, the State called 16 witnesses and offered numerous exhibits into evidence. The relevant testimony of the witnesses, in the order they testified at trial, is summarized below.

### Zachary Cairl

{¶ 5} Toledo Police Department ("TPD") officer Zachary Cairl testified he was on duty in the early morning hours of July 18, 2021 at Chevy's Place, a bar in downtown Toledo, when he heard gunshots in the distance. He ran towards the gunfire, and another officer directed him to a parking lot where S.C. was on the ground, with a female performing CPR on him. Once paramedics were on scene, he went to the Tin Can bar where he heard over his radio that the shooting suspect, who was described as a black

2.

male with dreadlocks and wearing a red hat and black shirt, fled in that direction. Cairl did not locate the suspect in that bar. He then returned to his assignment at Chevy's.

**Adrian Lanning**

{¶ 6} TPD patrol officer Adrian Lanning was also working on July 18, 2021, when he received a shots fired and person shot call. Lanning received the same description of the suspect and was eventually told he entered the Bronze Boar bar. Upon entering the bar, the manager informed him that the suspect was now wearing a gray shirt and that he was in the back patio area. He located the suspect, Walker, and detained him. Lanning did not see any visible injuries on Walker, although he did not lift his shirt. He also did not find a weapon on him. Walker appeared to be confused about why he was being detained, and acted like he did not know about the shooting incident.

{¶ 7} A member of the band that was playing at the bar told Lanning that another individual bought Walker a gray band t-shirt, and Walker tried to hand the band member a red hat. Lanning advised other officers at the scene to search for the articles of clothing. The red hat was recovered in a trash can on the back patio, but he could not recall where the black shirt was found. Lanning stood with Walker, who appeared slightly intoxicated, until detectives arrived.

**Kristi Eycke**

{¶ 8} Kristi Eycke testified she was a TPD police officer that had been assigned as a detective in the crime scene investigations unit ("SIU"). Her duties include responding to major crime scenes, collecting evidence and processing major crime scenes. She has processed thousands of crime scenes in her career, hundreds of which were murders. The

3.

training and education she received to become a crime scene detective included "training in evidence technician," fingerprint analysis and identification, blood spatter evidence and firearms, and photography schools.

{¶ 9} On July 18, 2021, at approximately 1:50 a.m., Eycke responded to the parking lot at 617 Monroe Street as the primary crime scene investigator. She was advised that an argument ensued between S.C. and another man during which S.C. was shot and fatally wounded. Police had detained a suspect. Eycke proceeded with processing the scene, and was informed that a cone was placed where a witness believed the shooter was standing when he fired the shots, which was about ten feet from S.C. Eycke took measurements at the scene.

{¶ 10} Eycke found and collected five .45 Underwood shell casings, expelled when a weapon is fired, spread around the scene. She stated the casings indicated that at least five rounds of ammunition were fired; however, she noted that the police did not find a firearm at the crime scene.

{¶ 11} Eycke attended the S.C.'s autopsy where she took photographs and collected the clothing S.C. was wearing and a couple of bullets which had been recovered from S.C.'s body. Eycke examined the clothing, looking for angles, burns and powder residue. Burns and powder residue can help with an estimation of proximity between S.C. and the shooter; if both are present, it suggests a close range or near contact shooting. Eycke did not see any burning or gunpowder residue near the bullet defect in S.C.'s clothing, which indicated the shooting was not at close range. No weapon was in S.C.'s belongings that Eycke collected at the autopsy. Eycke discovered no evidence

4.

which suggested that S.C. was armed. Eycke also swabbed S.C.'s left hand and his right palm and fingers, to collect DNA evidence if there had been a physical altercation.

{¶ 12} Eycke learned that Walker was the suspected shooter. If a suspect has any visible injuries on his body, it is part of Eycke's responsibilities to photograph and document those injuries. She was never asked to photograph any injuries for Walker, nor was anyone else in her unit.

**Megan Lisinski**

{¶ 13} Megan Lisinski, who was engaged to S.C., testified that they were invited to the July 17, 2021 Mud Hens game. Around 6:00 p.m., they and two friends took an Uber to downtown Toledo because they planned on drinking alcohol and did not want to drive home. They all had dinner and drinks; S.C. consumed two beers and two Fireball shots. After dinner, they went to the Mud Hens game. S.C. drank during the game. Just before the game ended, they all left and went to three nearby bars. S.C. drank beer at each stop.

{¶ 14} When they were ready to leave for the night, they all went outside to wait for a ride but got split up when S.C. left to use the restroom. Lisinski was not sure where S.C. went, and he did not know where she and the two friends went to wait for the ride. They all tried calling S.C.; once he answered he could not hear because he was someplace loud. The friends did not want to wait any longer and they left.

{¶ 15} Lisinski stayed by the Tin Can and Cock n Bull bars and walked around looking for S.C.; she also tried calling him. She was upset and crying because she was by herself, did not know where S.C. went, and was not familiar with the streets. Walker

5.

came up to her and asked if she was okay or if she needed help. She told him she was fine and was just looking for S.C. After Walker asked her a second time, S.C. walked up, angry and intoxicated, and told Walker to get away from his girl.

{¶ 16} Walker and S.C. began arguing. They started pushing each other and began rolling around on the ground when at some point, S.C. was on top of Walker. Lisinski was screaming at them to stop. A bystander pulled S.C. and Walker apart. Walker announced he had a gun and flashed it. S.C. did not have a weapon on him. Lisinski did not see any injuries on S.C., nor did see him bleeding.

{¶ 17} After Walker showed his gun, everyone backed away. Lisinski could not recall if Walker or S.C. said anything when the gun was flashed. S.C. walked away, but Walker stayed. Lisinski told Walker thanks and said he could leave. Walker stood still and S.C. came back. The men started arguing again. Both were yelling and cursing, when S.C. pushed Walker. Walker went backwards a few feet and then pulled out his gun. The men got away from each other a little bit, then S.C. started walking back to Walker and Walker shot him.

{¶ 18} Lisinski heard multiple gunshots. When S.C. got shot, he fell backward, and everybody ran, including Walker. Lisinski ran to S.C.; he did not say anything. She called 911 and started CPR. Police and medical personnel arrived. Lisinski later spoke with detectives and learned S.C. died as a result of his injuries.

6.

**Christopher Callow**

{¶ 19} Callow testified that he was part-owner of Hannon's Block Restaurant at the corner of Monroe and Erie Streets in downtown Toledo. On July 17, 2021, he arrived at Hannon's at about 10:45 a.m., and worked until around 11:45 or midnight, then left the restaurant. He and two coworkers, Hannah Osenbaugh and Cory, were smoking cigarettes in the parking lot at the back of the restaurant building when a fight broke out near the front of the parking lot right next to the restaurant. Callow saw the fight and heard a woman yelling "stop."

{¶ 20} Callow ran to the fight, grabbed the woman who was trying to break it up and pulled her away. S.C., who Callow described as bulkier than Walker, was on top of Walker throwing punches while Walker tried to defend himself and get away. The scuffle ended. Walker pulled out a gun and said, "Get the fuck away from me." Callow let go of the woman and started to walk towards the back of the restaurant building. Walker came up from behind, patted Callow on the back and thanked him for breaking up the fight. Despite it being dark, Callow noted that he was bigger than Walker; he did not notice if Walker was bleeding or injured.

{¶ 21} While they were talking, the woman who tried to break up the fight came back towards them and thanked Walker for checking up on her. S.C. then walked toward them with a look on his face, almost a blank stare, and "was focused on one thing and one thing only, and he was just trying to get at [Walker]" and fight again. S.C. was very intoxicated, got up into Walker's face, Walker pulled his gun for the second time and

7.

warned S.C. to get back, "get the fuck away from me, I'm not fucking playing around…get away from me. Continually trying to warn [S.C.] that . . . he was serious."

{¶ 22} S.C. and Walker were yelling at each other when S.C. came back and pushed Walker, who said "get the fuck away from me" again. S.C. did not go away and went to push Walker again; Walker fired four shots, rapidly. Walker ran one way, but there was a big fence blocking that way, so he ran the other way down an alley.

{¶ 23} Callow saw S.C. on the ground and walked over to see if he could render aid, but "there was no life left. Not struggling or trying to breathe." A police officer came over, within 30 seconds to a minute, and started CPR, then other police arrived.

### Hannah Osenbaugh

{¶ 24} Osenbaugh testified that on July 17, 2021, from 4:00 p.m. until approximately midnight, she was working at Hannon's Block as a server/bartender. After work, she walked out of the back of the restaurant with co-workers, Callow and Cory, and they sat on a ledge outside for a couple of minutes. While there, she heard a girl screaming for help from the front of the parking lot closest to Monroe Street. Callow walked around the ledge and building and saw people arguing and fighting. She and Cory followed.

{¶ 25} Osenbaugh saw Walker and S.C. fighting and a girl standing next to them. Walker was on the ground with S.C. over him striking him. Callow went over, pulled S.C. off, then Walker stood up, pulled a gun from his waist and showed the gun to S.C. S.C. and the girl walked off down Monroe Street or around the corner. Walker put his gun away and started walking towards Osenbaugh, Callow and Cory, who were headed

8.

back to the ledge area. Walker thanked Callow for stopping the fight. Although it was dark, Osenbaugh noticed that Walker had a grill in his mouth, which he took out to talk to Callow.

{¶ 26} As Osenbaugh, Callow, Cory, and Walker were standing together, she asked Walker where he was going. Before he answered, the girl who was previously screaming, came back around, approached the group, and thanked Walker for checking on her. Then, S.C. came back around the corner into the parking lot and he was angry, screaming racial slurs at Walker. The pair started to verbally argue, when Walker said to S.C. "something along the lines of give me your address or tell me your name, something about showing up at his mom's house or something." They continued bickering with S.C. still approaching Walker. At that time, Osenbaugh was next to Walker.

{¶ 27} As soon as Walker mentioned something about S.C.'s mother, S.C. jogged towards Walker and pushed him. Walker stumbled backwards, but did not fall down.

{¶ 28} At that point, Osenbaugh saw Walker reach where she thought he had placed the gun so she ran away. She did not actually see the gun. As she ran and crouched behind a vehicle, she heard three gunshots and called 911.

{¶ 29} After the gunfire, she saw Walker running into Hannon's parking lot but he realized he could not get out that way, so he turned around and ran. Osenbaugh observed S.C. lying in the parking lot, then police and medical personnel arrived. The police thought they had someone she could identify, so she was driven in a police car to the back alley of a bar where there were spotlights on a man. She did not think that was the man who did the shooting because the man's clothes were different and he looked

9.

different. The police also took Callow and Cory, individually, to see the suspected shooter.

### Paige Benson

{¶ 30} TPD officer Paige Benson testified that on July 18, 2021, she worked third shift with her partner, Officer Hughes, in the downtown and old west end areas. Officer Cairl advised by radio that there were shots fired across the street from Chevy's, he had a victim and was starting CPR. Benson said the alleged shooter's description came out over the air; he was a black male, had a red hat and dark shirt, and fled down the alley near Table Forty 4 restaurant. She and her partner started searching for the suspect in that general vicinity.

{¶ 31} Benson recalled that someone said the suspect was in the Bronze Boar, so she and Officer Hughes arrived at the bar entering through the front. They found Officer Lanning and his partner had Walker in custody.

{¶ 32} Benson and her partner were informed that no weapon was found, and the suspect was no longer wearing the clothing detailed in the initial description. While searching a trash can, she saw the described red hat and black shirt. She alerted command, was advised not to touch them and to remain near the trash can to protect the evidence until it could be collected. A crime scene investigator came out to photograph the evidence.

{¶ 33} Later, Benson and her partner transported Walker to the Safety Building by patrol vehicle. During transport, Walker was awake and very quiet; it did not appear that he was about to faint or pass out. Benson did not notice any injuries on Walker.

10.

**{¶ 34}** After Walker was finished at the Safety Building, Benson and her partner took him to the county jail for booking. Walker appeared to understand what was taking place, and did not indicate he needed medical assistance. After Walker was booked, Benson collected a silver grill or mouthpiece, which had been found during dress-out; it was located in Walker's sock. She took the grill to the Safety Building and booked it into the night property room.

### Henry Norwood

**{¶ 35}** Henry Norwood testified that he worked as a production manager and security manager at the Bronze Boar. The bar has video security surveillance both inside and outside.

**{¶ 36}** On July 17 and 18, 2021, Norwood worked at the Bronze Boar until 2:30 or 3:00 a.m. The bar was busy, and a band, Funk Factory, was performing on stage. He learned there was a shooting in close proximity to the Bronze Boar, and he was given a description of the shooter. He relayed the description to the guy at the front door and instructed the guy not to let anybody in the bar who fit that description.

**{¶ 37}** Norwood walked through the bar to see if anybody fit the shooter's description, but he did not see anybody. He walked around again and saw a man, later identified as Walker, who fit the description, but was wearing a wifebeater tank top, with a red hat and black shirt on the picnic table in front of him. Norwood stated that Bronze Boar will not allow people in the bar with just a wifebeater on because "[i]t just causes too much trouble." He therefore knew Walker did not enter the bar through the front door.

11.

**{¶ 38}** Norwood noticed Walker was at the table next to the stage where Funk Factory sold its merchandise. Directly behind the stage was a fence, on the other side of which was an alley. Norwood flagged down a police officer standing in front of the bar. The police located Walker in the bar.

**{¶ 39}** Norwood watched surveillance videos of the Bronze Boar from July 18, 2021, which showed clips of Walker, wearing a red hat, hopping the fence into the back patio area of the bar, walking into the bar, going upstairs, heading for the front door, and then walking out towards the back patio. The video showed flashing police lights, Norwood evacuating the bar, and the police apprehending Walker.

### Jason Ramm

**{¶ 40}** Jason Ramm's band, Funk Factory, played at the Bronze Boar on July 18, 2021, and sold its merchandise. He testified that the band was performing when the police asked the band to stop playing. The band stayed next to its merchandise table. A man came up to the table and asked to buy a shirt while another man reached around and tried to hand Jason a red hat; the men were African American. Ramm sold the first man the shirt. Later, Ramm spoke with the police and told them what he saw.

**{¶ 41}** Ramm identified, on the bar's video surveillance, Walker wearing the Funk Factory t-shirt that he had sold. Ramm did not actually see the man who attempted to hand over the red hat, as it was pretty busy around the merchandise table and other people were blocking the man.

### Kenneth Knight

12.

{¶ 42} Kenneth Knight testified he was an insurance agent and worked for himself at Knight Insurance Agency at 22 North Erie Street, in downtown Toledo. The building is located a block away from the Mud Hens stadium. He also owns the building at 14 North Erie.

{¶ 43} On July 19, 2021, Knight was contacted by the police and asked if he had video cameras pointed at the alley behind his buildings; he informed the police he had three cameras. Knight viewed the cameras' footage and saw a man walking down the alley and dropping a bag underneath the stairs. Knight called back the police and asked them to come and verify what was underneath the stairs.

### David Cogan

{¶ 44} David Cogan worked as the lab administrator at the TPD forensic laboratory. His duties included running aspects of the lab, test-firing weapons to determine whether they were operable and conducting firearm comparisons, where he compares firearm shell casings or projectiles to determine if they were fired from the same firearm.

{¶ 45} Cogan examined and tested items of evidence in Walker's case and generated two reports which contain his findings and conclusions. He conducted operability testing of a Taurus pistol, which had been recovered from behind Knight's office, and concluded the firearm was operable. He collected the shell casings and projectiles from those two test-fires and compared them to the five shell casings from the crime scene. He concluded that the five shell casings were fired from the Taurus pistol.

### John Howard

13.

{¶ 46} John Howard worked as a correction officer for the Lucas County Sheriff's Office, working intake, where he booked people into the Lucas County Jail. In the early morning of July 18, 2021, Howard came into contact with Walker. Howard patted Walker down, searched his clothing and body, and changed him out into the county suit. Walker's demeanor was "not loud, not quiet, just kind of there." Howard observed no injuries on Walker.

{¶ 47} When Howard was dressing Walker out, Walker handed Howard a sock, inside of which was a silver grill or mouthpiece. When Howard found the grill, Walker asked him to throw it away. Howard found that odd because "[m]ost of the time if someone asks you to discard something in the dress-out room it's because they don't want you to have it, such as like drugs, anything like that." Howard contacted his sergeant immediately, gave the grill to him, who then handed it off to the police.

**Cynthia Beisser, M.D.**

{¶ 48} Dr. Cynthia Beisser testified that she was the forensic pathologist at the Lucas County, Ohio Coroner's Office for 30 years, and was assigned cases that came under the coroner's jurisdiction, which included unnatural death, homicide, suicide and natural deaths that were unattended. Dr. Beisser was trained to evaluate gunshot wounds.

{¶ 49} On July 18, 2021, she was called to the shooting scene after S.C. was pronounced dead. The next day, Beisser performed an autopsy on S.C., after which she prepared a written report with her findings. She determined that S.C. had two gunshot wounds, designated as wounds A and B, an area of red abrasion, which is a scrape or a

14.

scratch, and a red contusion, which is a bruise, on the bridge of the nose which was two inches by one and three-quarters inches, and looked fresh.

{¶ 50} Wound A was a gunshot wound to S.C.'s chest, with no exit wound. There was no evidence of close-range firing. The wound track, which was parallel to the ground and left to right, passed through the heart and the root of the aorta, which is the largest artery in the body that comes out of the top of the heart, and passed through the lung and ended in the back. The doctor recovered the bullet from S.C.'s body. Wound A was fatal.

{¶ 51} Wound B was a gunshot wound to the side of S.C.'s left thigh. The wound track was downward, passing from the outside to the inside of the left thigh, just through the muscle, and exited on the inside of the left thigh; the bullet lodged under the skin of the right thigh, adjacent to the exit of the left thigh. There was no evidence of close-range firing. The doctor recovered the bullet. Wound B would not necessarily have been fatal, had S.C. received proper care.

{¶ 52} A toxicology screen was run and the results showed that S.C. had ethanol intoxication (alcohol), at .24 percent. The doctor acknowledged the case summary report indicated in one place that the ethanol level was .24, but in another place, the results were reported as .34. She explained the results come from the toxicology lab, and it was an error caused by the toxicology lab. Thus, she did not know whether it was .34 or .24, but it made little difference to her, as both were high levels of intoxication.

{¶ 53} Dr. Beisser filled out the death certificate for S.C.; the cause of death was multiple gunshot wounds, and the manner of death was homicide.

15.

## Shaun Conklin

{¶ 54} On July 17 and 18, 2021, TPD detective Shaun Conklin, assigned to the homicide unit, was on-call for any suspicious deaths, unnatural deaths or homicides.  He was notified there was a shooting and homicide, in downtown Toledo. When Conklin arrived at the crime scene around 1:00 a.m., the scene was secured and S.C.'s body was there.  SIU arrived about the same time as Conklin.  Walker was not yet in custody.

{¶ 55} The detectives walked the path, described by eyewitnesses, as the way Walker fled directly after the shooting.  While walking, Conklin noted that in the alley behind the parking lot, there were several security cameras on the buildings; one building was the Knight Insurance business.  Other officers on scene assisted by securing videos from the Bronze Boar and the Tin Can.

{¶ 56} The detectives went to interview Walker, who had been transported to the Safety Building.  Initially, Walker was asked to show his teeth so the detectives could see if he had silver teeth, but he had none.  Walker was wearing glasses, a gray t-shirt with the Funk Factory logo on the front, frayed styled jeans and bright red tennis shoes.  During the interview, which was recorded, Walker appeared to be very guarded in his responses to questions, and it seemed he tried to get more information from the detectives to see what they knew, rather than offering any answers to questions.

{¶ 57} Conklin described Walker as having a very selective memory since Walker conveniently remembered trying to help somebody but could not remember anything before that or after that.  His answers were very vague or he could not remember, but he did remember being a good guy.  Walker's inability to remember what had just happened

16.

an hour or so earlier did not seem genuine to Conklin; Walker did not seem to be suffering from anything which would impair his memory.

{¶ 58} At no point during the interview did Walker admit that he shot S.C., fought with S.C., or disposed of his clothes in a trash can at the Bronze Boar. Nor did Walker indicate that he had a gun, hid a gun, or acted in self-defense. Conklin did not observe any physical injuries on Walker's body, but Walker said he may have a bump on his head. When Walker lifted his hair and exposed his hairline, Conklin did not see anything, although he told Walker there might be a bump. Walker also lifted up his shirt to show Conklin an old scar, which was the only physical injury that Conklin saw on Walker's chest. Conklin was sitting a couple of feet from Walker in the interview room.

{¶ 59} The detectives repeatedly stated the possibility of Walker helping himself by explaining why the shooting happened. They wanted to hear from him that he was the shooter so they would know somebody else was not running around downtown with a gun. Even if Walker had admitted he shot S.C. in self-defense, Conklin would have gone forward with pressing charges.

{¶ 60} After the interview, Walker was taken to the Lucas County jail and during the booking process, when Walker was being dressed out, a silver grill was located in his sock and collected. Conklin told officers to book the grill as evidence.

{¶ 61} Conklin later obtained security footage from cameras on Knight's building. Knight informed Conklin about the exact location on the security video where somebody placed an item underneath some wooden stairs in the alley. Conklin went to that location and recovered a semi-automatic firearm from underneath the stairs.

17.

{¶ 62} Conklin requested that the gun be protected during booking so it could be swabbed for DNA; a swab of DNA was collected, and Conklin requested that it be sent to BCI for analysis. Conklin also collected Walker's DNA, pursuant to a search warrant, and the buccal swab of the inside of Walker's cheek was sent to BCI for analysis.

{¶ 63} The DNA results from the items sent to BCI indicated the following. Walker's shirt, located in the garbage can of the Bronze Boar, had S.C.'s DNA on a stain, which was presumptive positive for blood. This finding was not consistent with Walker's interview, as he did not disclose that he was in a physical altercation. In addition, Walker's DNA profile was located on swabs from the trigger of the firearm recovered, which was inconsistent with his interview because he never mentioned possessing a gun.

{¶ 64} When Conklin found the firearm, it was completely empty, the slide was locked back, and upon removal, the magazine was empty. The gun had a light and laser pointer, which Conklin believed were after-market features; the laser pointer improves accuracy.

{¶ 65} Conklin was asked about the physical difference between Walker and S.C. Conklin observed that S.C. was 28 pounds heavier and one inch shorter than Walker, which Conklin did not feel was a substantial size difference. Conklin contacted the prosecutor's office after Walker's police interview to advise that Walker was going to be charged with murder.

18.

**Verdict**

{¶ 66} At the conclusion of the testimony, closing arguments, and deliberations Walker was found guilty of the counts in the indictment. At sentencing, the trial court found the murder and felonious assault offenses merged for the purposes of final conviction and sentence, and the State elected to proceed on the murder count. The trial court sentenced Walker to 15 years to life in prison for murder, and 36 months for tampering with evidence. The court ordered the sentences to be served concurrently. It also imposed a mandatory and consecutive three-year prison term for the firearm specification attached to the murder count. In addition, at the time of the shooting, Walker was in the intervention in lieu of conviction program for another case, where he had pleaded guilty to carrying a concealed weapon. The court found Walker violated the terms of the program, found him guilty of the charge, and imposed 12 months in prison. Walker appealed.

**II. Assignments of Error**

{¶ 67} Walker sets forth four assignments of error:

I: The jury's finding of guilty to Murder was against the manifest weight of the evidence as Walker clearly acted in self-defense.
II: The jury's finding of guilty to Felonious Assault was against the manifest weight of the evidence.
III. The Trial Court erred when it found the State presented a race-neutral reason to strike only 1 of 2 African-American's [sic] from the jury pool.
IV. The Trial Court erred and abused its discretion by giving a "consciousness of guilty" jury instruction concerning Walker's actions after the shooting.

19.

### III. Analysis

### A. Manifest Weight of the Evidence

{¶ 68} Walker's first and second assignments of error challenge the jury's guilty verdicts for both murder and felonious assault as being against the manifest weight of the evidence because he clearly acted in self-defense. Walker presents identical arguments as to both and they will be addressed jointly.

{¶ 69} The State's burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to manifest weight review on appeal. *State v. Messenger*, 2022-Ohio-4562, ¶ 27. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). "In applying the manifest-weight standard, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury lost its way in resolving conflicts in the evidence, resulting in a manifest miscarriage of justice that necessitates a new trial." *State v. Woods*, 2023-Ohio-3549, ¶ 49 (6th Dist.), citing *Thompkins* at 387. "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." (Citation omitted.) *State v. Carter*, 2024-Ohio-1908, ¶ 33 (2d Dist.).

{¶ 70} "[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in

20.

self-defense." *Messenger* at ¶ 25. "[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden. *Id.* "Only after a defendant meets this burden does the burden shift to the state, and the state must demonstrate the defendant did not act in self-defense beyond a reasonable doubt." *Woods*, 2023-Ohio-3549, at ¶ 51 (6th Dist.), citing *Messenger* at ¶ 19-20; R.C. 2901.05(B)(1). The State satisfies this burden if it disproves any one of the elements of self-defense beyond a reasonable doubt. *Id.*, quoting *State v. Carney*, 2020-Ohio-2691, ¶ 31 (10th Dist.).

{¶ 71} "The elements of self-defense differ depending upon whether the defendant used deadly or non-deadly force." *State v. Tuggle*, 2023-Ohio-3965, ¶ 47 (6th Dist.). "A person may use deadly force in self-defense where he (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger." *State v. Lathan*, 2024-Ohio-2514, ¶ 77 (6th Dist.), citing *Messenger*, 2022-Ohio-4562, at ¶ 14.

{¶ 72} The parties do not dispute that S.C. was the initial aggressor; thus, the first element was met. As to the third element, under the recent amendments of R.C. 2901.09(B), "a person has no duty to retreat before using force in self-defense . . . if that person is in a place in which the person lawfully has a right to be." Walker was lawfully in a public area in downtown Toledo; thus, he had no duty to retreat.

{¶ 73} Accordingly, the resolution of the assignments of error lie in the second element: whether Waker had a reasonable belief that he was in imminent danger of death or great bodily harm. This element is a combined subjective and objective test. *Woods*, 2023-Ohio-3549, at ¶ 54. "'[A]n individual's belief that he or she was in imminent danger must be objectively reasonable, and the individual must have an honest subjective belief to that effect.'" (Citation omitted.) *State v. Alexander*, 2023-Ohio-3450, ¶ 19 (9th Dist.) "A bona fide belief requires weighing the use of force against the believed danger, permitting 'only such force as is necessary to repel an attack.'" *Woods* at ¶ 54, quoting *State v. Lane*, 2023-Ohio-1305, ¶ 24 (6th Dist.). Shooting has been considered disproportionate force in response to being pushed by an individual that is physically bigger and stronger than the shooter. *See State v. Smith*, 2023-Ohio-3015 (3d Dist.)

{¶ 74} Additionally, a defendant's actions following a crime can demonstrate consciousness of guilt. *State v. Knuff*, 2024-Ohio-902, ¶ 211 (cutting up and disposing of bloodstained carpet and attempts to wipe blood from the walls and ceiling "strongly" suggested the defendant's consciousness of guilt); *State v. Mason*, 2024-Ohio-2796, ¶ 26 (9th Dist.)(defendant disabling a Ring camera before leaving the crime scene and hiding from police evidenced that the victim was shot without justification); *State v. Rose*, 2022-Ohio-3197, ¶ 74 (11th Dist.) (defendant's flight, discarding of weapons, and dishonest statements undermined his self-defense claim.)

{¶ 75} Here, the jury reasonably could have determined that Walker lacked an objectionably reasonable belief that he was in imminent danger of death or great bodily harm when he fired his weapon at least five times, shooting S.C. twice. The initial

22.

scuffle between S.C. and Walker resulted in S.C. being on top of Walker and hitting him. After a bystander separated the two men, however, it was S.C. that suffered visible injuries, and not Walker. A crowd remained nearby when S.C. pushed Walker a second time. When S.C. approached the third time, Walker fired his gun.

{¶ 76} The coroner's testimony and report reveal the absence of gunpowder stippling or soot at the wound sites evidencing that Walker's gun was not fired at close range. Gunshot wound A, on S.C.'s chest, tracks left to right, horizontal, and backward. Gunshot wound B, on S.C.'s left thigh, tracks left to right, downward, and backward. The bullet trajectories suggest that S.C. was not approaching Walker head-on when he was shot.

{¶ 77} Further, Walker's actions after the shooting evidence consciousness of guilt, undermining the argument that he shot S.C. in self-defense. Walker fled the scene, hid the gun, changed his appearance by purchasing a t-shirt from a band playing at a nearby bar, and threw away the shirt and hat he was wearing during the altercation. Jail employees recovered the silver grill or mouthpiece he was wearing from his sock during the booking process. Finally, during police questioning, though he recalled that just before the altercation he asked S.C.'s fiancé, who was crying, if she was okay, he claimed he had no recollection of the subsequent events.

{¶ 78} Based on the foregoing, the State did not fail to carry its burden of persuasion on Walker's claim of self-defense and the jury's conclusion that Walker did not act in self-defense was not against the manifest weight of the evidence. Walker's first and second assignments of error are not well-taken.

23.

## B. Baston Challenge

{¶ 79} Walker's third assignment of error challenges the trial court's ruling that the State presented a race-neutral reason to strike one of the two African American jurors from the jury pool. Walker relies on *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), where the court held that "the Equal Protection Clause [of the United States Constitution] forbids the prosecutor to challenge potential jurors solely on account of their race[.]"

{¶ 80} Walker submits the State used its peremptory challenge to remove Juror 12, a potential juror who was African American, to which his defense counsel lodged an objection. The State explained its basis for the objection as follows:

> In questioning [Juror 12], he appeared to have apparent dislike for counsel. His tone and body language and his mannerism, which may not come over on the record because they were physical cues that the State of Ohio was watching and intently engaging in with Juror 12, because – with Juror Number 12, because I was receiving negative tone and body language and mannerisms form him. And we believe that is a race neutral unbiased reason to exclude him at this time.

{¶ 81} Walker contends his counsel again objected arguing "vibes" are not something you can take into consideration, but the trial court overruled the objection and found the State presented a race neutral reason to remove Juror 12. Walker asserts the State asked Juror 12 "only a couple of questions[,]" which were:

> . . . could [Juror 12] set aside any feelings of sympathy and find Walker guilty if [Juror 12] believed the State proved its case beyond a reasonable doubt and [Juror 12] answered he could. . . . The State then asked [Juror 12] about his thoughts about a person recounting a story not being able to remember all of the details[, and Juror 12] agreed with the State that it is possible to not remember small things, but that he would remember the big things. [Juror 12] agreed with the State that he would 'take into account all the facts that's presented and judge accordingly[,]' . . . [and] [h]e agreed with the State that he would take into consideration any contradiction in the

witness' statements with the rest of the evidence presented. . . . [Juror 12] . . . agreed that a person recounting a story some time later with differences in the stories is not indicative of lying.

{¶ 82} Walker further argues that two other potential jurors, Jurors 5 and 11, gave "the exact same answers" as Juror 12, but "[t]he State did not ask for Jurors 5 or 11 to be excused, and Defense asked for only 11 to be excused."  Walker asserts "[t]he State did not like the 'vibes' of a juror [Juror 12] who agreed with every question asked by the State, . . . did not give equivocal answers[,] . . . gave the same answers as other jurors who the State did not seek to remove and gave no indication that he could not serve as an impartial juror."

{¶ 83} Walker also contends that "[t]o proceed without a juror [Juror 12] who is the same race as Walker, who stated he would be fair and impartial and find Walker guilty without any feelings of sympathy if he believed the State proved their case beyond a reasonable doubt is the very definition of denying Walker his rights under *Batson*."

{¶ 84} The State argues that Walker's arguments fail because the trial court did not find, "on the basis of all the circumstances that purposeful racial discrimination had taken place."  The State maintains that when it challenged Juror 12, it provided a race-neutral explanation for this strike[, and] . . . the trial judge apparently agreed with the State."

{¶ 85} In *Batson*, the Supreme Court of the United States ruled that when a defendant alleges that the State purposely discriminated by using peremptory challenges in jury selection based on the race of a prospective juror, the defendant has the burden of establishing such discrimination.  *Id.* at 91, 93.  The defendant "may make out a prima

25.

facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93-94. If the defendant satisfies his burden, then it is the State's burden to explain its race-neutral reasons for challenging a potential juror. *Id.* at 94, 98. Finally, the trial court ought to consider all of the pertinent circumstances when deciding if the defendant established that the State purposefully discriminated. *Id.* at 98.

{¶ 86} In *Powers v. Ohio*, 499 U.S. 400, 415 (1991), the Supreme Court of the United States held that potential jurors who were excluded do not have to be the same race as the defendant. ("[A] defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race. . . . To bar [a defendant's] claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service.").

{¶ 87} With respect to the State's proffered reasons for challenging a juror, "'[t]he trial judge must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination.'" *State v. Garrett*, 2022-Ohio-4218, ¶ 69, quoting *Flowers v. Mississippi*, 588 U.S. 284, 298 (2019). Assessing the plausibility of' the prosecutor's reason for striking the juror, "'race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance.'" *Id.*, quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).

26.

{¶ 88} In addition, in *State v. Stalder*, 2023-Ohio-2359, ¶ 17, the Supreme Court of Ohio recognized that in order for a defendant to meet his burden of demonstrating a prima facie case of purposeful discrimination, the defendant must show members of a cognizable [racial] group were peremptorily challenged by the State. Furthermore, the *Stalder* court held "that when a party objecting to a peremptory challenge offers a bare allegation of [racial] discrimination and fails to set forth any other relevant facts and circumstances to raise an inference of [racial] discrimination, that party fails to establish a prima facie case of purposeful [racial] discrimination. *Id.* at ¶ 26.

{¶ 89} "The conclusion of the trial court that the state did not possess discriminatory intent in the exercise of its peremptory challenges will not be reversed on appeal absent a determination that it was clearly erroneous." *State v. Hernandez*, 63 Ohio St.3d 577, 583 (1992), citing *Hernandez v. New York*, 500 U.S. 352, 369 (1991).

{¶ 90} Here, the record reveals that during jury selection at Walker's trial, there were three potential jurors who were African American. One potential juror, Juror 8, was excused for cause by the court due to hardship concerns; Walker encouraged and acquiesced in excusing Juror 8. The second potential juror was seated on the jury, and the third potential juror, Juror 12, was peremptorily challenged by the State.

{¶ 91} Walker's attorney objected to the State's challenge of Juror 12 on the basis of *Batson*, arguing, inter alia, that he did not believe the State indicated any reason why Juror 12 could not serve as an impartial juror. The reason given by the State for challenging Juror 12 was based on the juror's physical cues - the prosecutor received

27.

negative tones, body language and mannerisms from him, and he appeared to have apparent dislike for the prosecutor.

{¶ 92} The trial court ruled the State satisfied the requirements under *Batson* by identifying a race neutral basis for excusing Juror 12 with a peremptory challenge, such that there was no purposeful discrimination shown.

{¶ 93} Upon our review of the record, regarding whether Walker made a prima facie case that the State engaged in purposeful racial discrimination as to Juror 12, there is evidence in the record to support a finding that Walker's counsel made a proper showing that Juror 12, an African American individual who is a member of a cognizable racial group, was peremptorily challenged by the State.[1]  In addition, the grounds and facts offered by Walker's counsel for his objection to the State's peremptory challenge of Juror 12, give rise to an inference of purposeful discrimination, such that Walker satisfied his burden under *Batson*.

{¶ 94} Regarding the State's burden, under *Batson*, there is evidence in the record that the State justified its peremptory challenge with a race neutral reason, by identifying the juror's negative tones, body language and mannerisms, and apparent dislike for the prosecutor.

---

[1]We note that Walker's counsel characterized Walker as an African American, but Walker declared, at a status hearing held on March 10, 2022, that he identifies as a Moor (". . .[O]n all of my paperwork that I received in my motion of discovery it says I'm listed as black.  My skin is not black.  It is brown.  I'm not African American.  I am a Moor[.]").  Notwithstanding, Walker's counsel complied with *Powers* and *Stalder*, as there is no requirement that Walker be a member of the cognizable racial group.

28.

**{¶ 95}** Based upon the foregoing, the record does not support Walker's assertion that the trial court erred when it determined that the State presented a race-neutral reason to strike Juror 12 from the jury pool. We therefore find the evidence in the record does not show that the trial court's decision was clearly erroneous. Accordingly, Walker's third assignment of error is not well-taken.

## C. Consciousness of Guilt Jury Instruction

**{¶ 96}** In his fourth assignment of error, Walker contends that the trial court erred and abused its discretion when it gave a consciousness of guilt jury instruction, over Walker's objection, concerning his actions after the shooting. Walker asserts "whether he fired his weapon in self-defense was to be judged solely on the circumstances at the moment, and moments leading up to, when he fired, and not afterwards."

**{¶ 97}** Walker contends the jury was instructed to assess Walker and the S.C.'s actions and behaviors during those two fights. And "[f]or a jury to be told they can look, and judge, whether Walker had a reasonable fear of death based upon what he did after he fired his gun is tantamount to wiping away the self-defense argument."

**{¶ 98}** The State counters that Walker's assertions that his actions of fleeing the scene and attempting to disguise his appearance so as to avoid apprehension are irrelevant to the issue of self-defense, are meritless. The State asserts that Walker's fleeing and trying to disguise his appearance, indicate that he was aware his actions were not in self-defense, and that "he knew he used excessive and deadly force to shoot an unarmed man five times."

29.

**{¶ 99}** "A trial court is obligated to provide jury instructions that correctly and completely state the law." *State v. Nye*, 2021-Ohio-2557, ¶ 14 (6th Dist.). "The jury instructions must also be warranted by the evidence presented in a case." *Id.*; *see Knuff*, 2024-Ohio-902, at ¶ 182 ("[R]equested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction."). A trial court's instructions to a jury are reviewed for an abuse of discretion. *State v. Peabody*, 2024-Ohio-185, ¶ 83 (6th Dist.), citing *State v. White*, 2013-Ohio-51, ¶ 97 (6th Dist.).

> Here, the trial court provided the following instruction to the jury:
>
> Testimony has been admitted indicating that the defendant either fled the scene, resisted arrest, falsified his identity, changed appearance intimidated a witness, or attempted to conceal a crime. You're instructed that defendant's conduct alone does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness or awareness of guilt. If you find that the facts do not support that the defendant engaged in such conduct, or if you find that some other motive prompted the defendant's conduct, or if you're unable to decide what the defendant's motivations were, then you should not consider this evidence for any purpose. However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by consciousness or an awareness of guilt, you may but are not required to consider that evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight if any to give to this evidence.

**{¶ 100}** In *State v. Roberts*, 2023-Ohio-142, ¶ 94 (6th Dist.), this court noted that actions which indicate a defendant's consciousness of guilt are amongst the surrounding facts or circumstances the trier of fact may use to infer the defendant's purpose. Thus, actions "following the completion of a crime may be relevant evidence of consciousness

30.

of guilt.'" *Id.*, citing *State v. Johnson*, 2015-Ohio-4903, ¶ 72.  In *State v. Herrell*, 2017-Ohio-7109, ¶ 24 (6th Dist.), this court addressed the issue of a jury instruction on flight.  The court observed that the term flight means an escape or affirmative attempt by an accused to avoid being apprehended after a crime was committed, which includes fleeing from police or witnesses and/or altering or disguising physical characteristics.  The court ruled that changing clothes is sufficient to establish that an accused altered his or her appearance.  *Id.*, citing *State v. Braylock*, 2010-Ohio-4722, ¶ 38 (6th Dist.).

{¶ 101} In *State v. Howell*, 2010-Ohio-3403, ¶ 27 (8th Dist.), the court noted the trial court had instructed the jury that if it determined that Howell had changed his appearance to avoid apprehension, this evidence could indicate his awareness or consciousness of guilt.  Howell argued on appeal that the trial court erred in giving the jury this instruction since there was no evidence that he attempted to flee or avoid apprehension.  *Id.*

{¶ 102} The *Howell* court mentioned that "[t]he video recording of the incident showed the robber wearing jeans containing a distinctive rainbow design, a gray sweatshirt, and dark boots.  When Howell reported to the hospital an hour and thirty minutes later, he was still wearing the same jeans, but without the gray sweatshirt, and had on tan boots."  *Id.* at ¶ 29.  The court found that "[t]his evidence, combined with Howell's unexplained failure to call the police or seek immediate medical attention when he was shot, suggested that Howell changed his appearance to avoid apprehension."  *Id.*  The court further found "no abuse of discretion in the trial court's jury instruction, as the evidence indicated that Howell changed his appearance to avoid detection."  *Id.* at ¶ 30.

31.

{¶ 103} Here, denying Walker's request to remove the instruction the trial court

stated:

> to warrant a flight instruction it must[] be clear that the defendant took affirmative steps to avoid detection and apprehension beyond simply leaving the scene of the crime." The court found that sufficient evidence was presented that Walker "took affirmative steps that evening in an attempt to conceal his identity as police were searching the area[,] as well as when just being questioned while detained but not under arrest[,]. . . coupled with leaving the gun in the alleyway, changing his clothes, removing articles of clothing that he wore, and trying to give them to other people, and ultimately depositing them in a trash receptable.

{¶ 104} Upon review of the record and the relevant law, the court finds that the

consciousness of guilt instruction given to the jury by the trial court adequately reflected

issues argued by the parties before the trial court, as well as the evidence presented at

trial. The instruction was appropriate because the record contained evidence from which

reasonable minds might reach the conclusion sought by the instruction. Further, the

instruction given by the trial court was a fair and correct statement of the law, despite

Walker's assertion that "whether he fired his weapon in self-defense was to be judged

solely on the circumstances at the moment, and moments leading up to, when he fired,

and not afterwards." Thus, the trial court did not abuse its discretion by providing the

jury with the instruction regarding consciousness of guilt. Walker's fourth assignment of

error is not well-taken.

32.

## IV. Conclusion

{¶ 105} Based upon the foregoing, the judgment of the Lucas County Court of Common Pleas is affirmed. Walker is ordered to pay the costs of this appeal, pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Charles E. Sulek, P.J.

_____
JUDGE

Christine E. Mayle, J.
CONCURS AND WRITES
SEPARATELY.

_____
JUDGE

Myron C. Duhart, J.
DISSENTS AND WRITES
SEPARATELY.

### MAYLE, J., CONCURRING

{¶ 106} I agree with the decision and analysis of the lead opinion in full. Although the dissent lays out a well-reasoned, thoughtful, and sound interpretation of the evidence presented at trial, "an appellate court may not merely substitute its view for that of the trier of fact" when conducting a manifest-weight review of the evidence. *State v. Baatin*, 2011-Ohio-6294, ¶ 10 (10th Dist.). Rather, an appellate court's reversal on manifest-weight grounds is reserved for the "'exceptional case in which the evidence

33.

weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 107} Here, I cannot conclude that this is an exceptional case that resulted in a clear miscarriage of justice because a reasonable jury could have concluded that Walker did not act in self-defense when he fired five shots at an unarmed man—one hitting the victim's chest and another hitting the side of the victim's left thigh. Ohio law recognizes that "[f]iring multiple shots undermines a claim of self-defense." *State v. Roland*, 2017-Ohio-557, ¶ 21 (10th Dist.). This makes sense, given that self-defense is available where the defendant used "'only such force as is necessary to repel an attack'" and the force was not "'so disproportionate that it shows a purpose to injure . . . .'" *State v. Woods*, 2023-Ohio-3549, ¶ 54, 56 (6th Dist.), quoting *State v. Lane*, 2023-Ohio-1305, ¶ 24 (6th Dist.); and *State v. Barker,* 2022-Ohio-3756, ¶ 28 (2d Dist.). *See also, e.g., State v. Smith*, 2023-Ohio-3015, ¶ 42 (3d Dist.) (Rejecting a manifest-weight challenge where "the jury could have concluded that [defendant's] use of deadly force was a disproportionate response to being pushed."). It was well within the province of the jury to conclude that the *amount* of force here—five gunshots—was disproportionate to the perceived threat, which would preclude a finding that Walker acted in self-defense.

{¶ 108} For this reason, it is my view that Walker's conviction is not against the manifest weight of the evidence, even though a different jury panel could have reached a different conclusion based on the evidence presented at trial. A conviction is not against the manifest weight of the evidence simply because the evidence is subject to different interpretations. *State v. Eldridge*, 2023-Ohio-3998, ¶ 44 (2d Dist.).

34.

**DUHART, J., Dissenting**

{¶ 109} I agree with the majority's conclusions as to the third and fourth assignments of error, but I disagree with the majority's resolution of the first and second assignments of error.

{¶ 110} In my view, the manifest weight of the evidence shows that Walker acted in self-defense when he used deadly force to stop S.C.'s physical assaults. The majority found, and I agree, that the parties do not dispute two of the elements of self-defense: S.C. was the initial aggressor of the situation, and Walker was lawfully in a public area and had no duty to retreat from the situation. As to the disputed element of self-defense, I believe, unlike the majority, that Walker presented evidence that tends to support that he had a reasonable belief, both objectionably and subjectively, that he was in imminent danger of death or great bodily harm when he fired his weapon and shot S.C. I also believe that the State failed to disprove, beyond a reasonable doubt, that Walker acted in self-defense.

{¶ 111} While I accept the facts and witness testimony set forth by the majority as correct, I believe certain evidence merits a more complete presentation and emphasis. In addition, I feel it is important to fully address the arguments offered by Walker, and the State's responses thereto concerning the first and second assignments of error.

### Walker's Arguments – First and Second Assignments of Error

{¶ 112} Walker argues the jury's findings that he was guilty of murder and felonious assault were against the manifest weight of the evidence because he did not assault or murder S.C. Rather, Walker defended himself from S.C.'s attacks.

35.

**{¶ 113}** Walker asserts he did not create the situation that gave rise to the shooting. He contends he was lawfully on the sidewalk when S.C., a total stranger who was highly intoxicated and aggressive, provoked a verbal dispute then physical fight, knocking Walker to the ground and punching Walker until S.C. was pulled off by a bystander. Walker flashed his gun and warned S.C. to get away. The men walked away from each other, but S.C. came back at Walker, got in Walker's face, pushed Walker backwards and advanced towards Walker again. Walker insists S.C.'s actions were the definition of life-threatening behaviors which any rational person would be scared to face.

**{¶ 114}** Walker submits he had no way of knowing whether his attacker had a weapon, but Walker knew S.C. had already gotten the upper hand in the fight when S.C. punched Walker multiple times. Then, when S.C. came back for a second fight, Walker "knew at that moment . . . nothing was going to deter [S.C., who] was out of control and any person in this situation was reasonable in his fear that [S.C.] was going to knock him to the ground again and continue to beat Walker, because it already happened."

**{¶ 115}** Walker argues the State cannot prove beyond a reasonable doubt that he used any greater force than was necessary to repel a larger, angry, drunk man off of him. Walker asserts he "was not in 'apparent' danger. He was in danger." Walker queries "[w]here was [he] to go following the second attack? Just a few more feet down the sidewalk only to be attacked a third time[?]" Walker submits the standard is reasonable fear of serious bodily injury or death, not actually suffering serious bodily injury or death. He contends it was objectively and subjectively reasonable for him to believe S.C. was

36.

intent on causing serious bodily harm, if not death, and the force Walker used was reasonable. Walker asserts the State did not prove beyond a reasonable doubt that he could have used force other than deadly force to repel S.C.

{¶ 116} Walker further argues there was no evidence of revenge. After being attacked the first time, Walker warned S.C. to stay away. Walker walked away from S.C., as he "was done" with S.C., but S.C. was not done with Walker and S.C. did not let Walker go away.

### State's Responses

{¶ 117} The State counters that Walker did not have a bona fide belief he was in imminent danger of death or great bodily harm, because although S.C. initiated the conflict, it was only a fist fight and a push. As a result of the fight, S.C. had injuries to his face, but Walker was not injured or bleeding. After the fight, S.C. "merely pushed Walker away" then Walker fired five shots at S.C. The State asserts Walker was not in reasonable fear that an unarmed man would cause him death or great bodily harm.

{¶ 118} The State maintains that Walker was at fault in creating and/or exacerbating an already volatile situation, because during the fight, he was heard to threaten S.C.'s mother by saying "something along the lines of give me your address or tell me your name, something about showing up at his mom's house[.]"

{¶ 119} The State also argues Walker used an excessive and unreasonable amount of force during the encounter with S.C. The State submits Walker claimed S.C. was charging at him when he fired the gun, yet this claim does not match the coroner's

testimony that the gunshot wounds were not straight on but were inflicted slightly left to right.

{¶ 120} In addition, the State contends the bullet tracks on S.C.'s thighs went from the left side of the body to the right, which indicates S.C. was not charging Walker when the gun was fired but was turning to leave when he was shot five times. The State maintains if S.C. had been charging at Walker when the gun was fired, the wound tracks would be from the front of the chest and out of the back, and from the front of the thigh and out of the back of thigh. This evidence and testimony indicate that Walker did not act in self-defense, but rather, used an excessive, unreasonable and a disproportionate amount of force.

**Law and Analysis**

{¶ 121} The Supreme Court of Ohio clarified the burden of proof when a self-defense claim is asserted such that a defendant's burden of production is to present evidence which *tends to support* the defendant used force in self-defense, and this burden "is not a heavy one and . . . might even be satisfied through the state's own evidence." *Messenger*, 2022-Ohio-4562 at ¶ 20, 22. Thus, "if the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden," and the State has the burden of disproving the self-defense claim beyond a reasonable doubt. *Id.* at ¶ 25, 27.

38.

**Elements of Self-Defense**

{¶ 122} The parties do not dispute that Walker satisfied two elements of self-defense. The resolution of the assignments of error rests in the remaining element: whether Waker had a reasonable belief that he was in imminent danger of great bodily harm or death and used reasonable force to defend himself.

Bona Fide Belief Law

{¶ 123} To determine whether a defendant had a bona fide belief that he was in imminent danger of great bodily harm or death, courts employ a combined objective and subjective test. *State v. Thomas*, 77 Ohio St.3d 323, 328, 1997-Ohio-269. First, a jury must consider a defendant's situation objectively, and whether, viewing a defendant's particular characteristics, knowledge or lack thereof, history, circumstances, and the conditions *at the time of the attack*, the defendant reasonably believed he was in imminent danger. *Id.* If the objective test is satisfied, then the jury must determine if this defendant subjectively had an honest belief that he was in imminent danger. *Id.*

{¶ 124} Thus, self-defense "'is placed on the grounds of the bona fides of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties.'" *Id.*, quoting *State v. Sheets*, 115 Ohio St. 308, 310 (1926). This also requires consideration of the force used in relation to the danger a defendant believed he was in. *State v. Lane*, 2023-Ohio-1305, ¶ 24 (6th Dist.). A defendant may use only that force as is reasonably necessary to repel the attack. *Id.* If the amount of force used was so disproportionate that it shows a purpose to injure, self-defense is not available. *Id.*

39.

**Walker's Self-Defense Burden**

<u>Objective Test</u>

{¶ 125} Applying the objective portion of the test set forth in *Thomas* to the evidence in the record reveals that Walker, a black man walking alone late at night in downtown Toledo, asked a crying woman, who was white, if she was alright. She said she was, after which a stranger who was bulky, white, highly intoxicated and belligerent, walked up yelling at Walker, provoked a verbal argument and then a physical fight. Walker found himself on the ground, underneath the stranger, being punched until a bystander pulled the stranger off. Walker got up from the ground, flashed a gun and told the stranger to get away. Walker had no way of knowing if the stranger had a weapon. The stranger and the female companion walked away. Walker then put the gun away and proceeded to walk in the opposite direction while thanking the bystander for stopping the fight.

{¶ 126} The female companion came back up to Walker and thanked him. The stranger then came towards Walker, yelling and spewing racial slurs. The men yelled at each other, Walker told the stranger multiple times to get away, but the stranger came up to Walker and pushed him backwards a few steps. Walker flashed his gun and again warned the stranger numerous times to get back, but the stranger came at Walker for the third time, and Walker responded by firing his gun.

{¶ 127} I would find the objective part of the *Thomas* test was satisfied. Eyewitness testimony established that Walker was the victim of an unprovoked attack by a stranger and tried to extricate himself from any further violence by the stranger, but the

40.

stranger assailed Walker a second time, and was advancing on Walker for the third time. Walker had no knowledge as to whether the hostile, drunk stranger was armed. It was reasonable for Walker to be in fear for his safety and his life due to the unwarranted physical confrontations he had endured from the out-of-control stranger, the first of which only ended when a bystander intervened.

### Subjective Test

{¶ 128} Applying the subjective part of the *Thomas* test to the evidence shows that Walker was unexpectedly attacked in public by a drunk, enraged stranger, who took Walker to the ground, punched him repeatedly and overpowered Walker such that Walker was unable to defend himself. After the bystander pulled the stranger off of Walker and Walker got to his feet, Walker tried to deter the stranger from resuming the assault by flashing his gun and warning the stranger to get away. Walker had no way of knowing if the stranger had a weapon.

{¶ 129} Walker put the gun away and continued on his way when he was again accosted by the stranger who got in his face and pushed him backwards, despite Walker's repeated warnings for the stranger to go away. Walker again flashed his gun and reiterated the warnings for the stranger to get back, but the stranger came at Walker a third time. The stranger continued to pose a threat to Walker by exerting violence on Walker. Walker responded to the stranger's successive assaults and unyielding physical threat by firing the gun rapidly five times, striking the stranger twice.

41.

{¶ 130} I would find the subjective part of the *Thomas* test was satisfied. Walker's actions were those of a man who honestly feared for his physical safety and had to protect himself and thwart S.C. from an imminent assault.

**The State's Burden of Disproving Self-Defense**

{¶ 131} Since I believe Walker satisfied his burden, the State had the burden of disproving Walker's self-defense claim, beyond a reasonable doubt.

Bona Fide Belief of Imminent Fear of Great Harm or Death[2]

{¶ 132} The evidence presented at trial and relied on by the State to establish that Walker did not have a bona fide belief that he was in imminent danger of great bodily harm or death, was that S.C. took offense when Walker spoke to the female companion. As a result, S.C. initiated the conflict with Walker which was a fist fight and a push that caused injury and bleeding to S.C. but did not cause injury or bleeding to Walker. S.C. again pushed Walker and Walker fired five shots rapidly at S.C., who was unarmed. Two of those shots struck S.C., one of the shots was fatal.

{¶ 133} The *White* and *Smith* cases were cited by the State in support of its position that Walker did not have a bona fide belief that he was in imminent danger of great bodily harm or death from S.C. The *White* and *Smith* cases are factually distinguishable from Walker's case. Walker did not initiate the attack, Walker did not know his attacker, Walker did not use force when his attacker's back was turned, and Walker used force on one occasion against his attacker, not several times.

---

[2] The State, in its brief, argued bona fide belief of imminent fear and use of force separately. I will therefore address them in this manner.

42.

{¶ 134} In *State v. White*, 2022-Ohio-2130 (8th Dist.), White's friend punched White in the chest, White punched his friend, and the friend punched White several more times. *Id.* at ¶ 6. A witness saw the friend walk away from White while White went to a car, grabbed a gun, and shot at the friend. *Id.* White testified that after the fight he walked away and headed towards a car but then saw his friend approach him. *Id.* at ¶ 7. White "grabbed an AR-15 that was in the back seat of the car and told the [friend] to back up." *Id.* White said his friend got mad when White pulled out the gun and kept coming closer, White told his friend to back up and White backed up himself, but his friend kept coming. *Id.* White shot his friend three times, then "shot a fourth time and saw [his] arm move. *Id.* Finally, White shot [his friend] in the face because he felt he had to do it to stop [his friend] from advancing." *Id.* The friend died. *Id.*

{¶ 135} The court found overwhelming evidence of White's guilt. *Id.* at ¶ 26. The court found White's testimony disproved his self-defense claim because even if the friend was advancing on White, there was no evidence that placed White in fear of imminent danger of great bodily harm or death as the men were friends who never fought before. *Id.* at ¶ 27. The court found White's response to pick up an assault rifle and shoot his unarmed friend five times "far exceeded a defensive response to his perceived danger." *Id.*

{¶ 136} In *State v. Smith*, 1975 WL 182629, *1 (8th Dist. April 17, 1975), Smith was at a party in the basement of a house when, according to the victim, Smith spit in the victim's face and the victim struck Smith with a bag containing a bottle. The men fought until the owner of the house broke up the fight and ordered them outside. *Id.* The victim

43.

testified as he walked up the basement steps, Smith stabbed him in the back and cut him on the face. *Id.* While outside, the men continued to fight with the victim boxing Smith until someone shouted that Smith had a knife; the victim then realized his hands were cut. *Id.*

{¶ 137} Smith denied stabbing the victim on the basement steps but admitted he "stuck" the victim with a knife and slashed at him. *Id.*

{¶ 138} The appellate court, noting the issue at trial was whether Smith was justified in using knives in self-defense, found the trial court's decision that Smith used more force than necessary to defend himself was not against the manifest weight of the evidence. *Id.*

{¶ 139} I believe the evidence and law relied on by the State did not disprove, beyond a reasonable doubt, that Walker had a bona fide belief that he was in imminent danger of great bodily harm or death. The State's over-simplification of the facts, that this was merely a fist fight and a push by S.C., is belied by the evidence in the record, including the detailed witness testimony as to, inter alia, S.C.'s intoxication, belligerence and continued pursuit of Walker.

{¶ 140} Moreover, the State's reliance on the evidence that Walker was not bleeding or visibly injured is misplaced and irrelevant to Walker's belief that he was in imminent danger of great bodily harm or death. The standard is reasonable fear of serious bodily injury or death, not having visible injuries or actually suffering serious bodily injury or death. Thus, a defendant's lack of visible injuries is not a bar to a self-defense claim.

44.

Use of Force

{¶ 141} In its brief, the State argues that Walker used excessive and unreasonable force because his claim, that S.C. was charging at him when he fired the gun, does not match the coroner's testimony that the gunshot wounds were not straight on but were inflicted slightly left to right. The State relies on the coroner's report, not her trial testimony, that the "'wound track [of the chest wound] is left to right, horizontal, and backward.'" The State contends the wound tracks indicate that S.C. was not charging at Walker but was in the process of turning around and leaving when he was shot. It is noteworthy that the State did not raise as an issue that the amount of force Walker used, based on the number of shots fired, was excessive or unreasonable.

{¶ 142} A review of Dr. Beisser's testimony reveals that she did not testify that the gunshots wounds were not straight on. As to Wound A, the doctor did not testify that the wound direction was from left to right. There is also no mention in the coroner's report that the gunshot wounds were not straight on, but the report provides Wound A's path. Thus, the basis for the State's contention that Walker used excessive and unreasonable force (because S.C. was not charging Walker when Walker shot the gun) is not supported by the testimony or report of the coroner, as she did not testify or indicate that the gunshot wounds were not straight on. Moreover, the eyewitness testimony was that S.C. started to walk back to Walker and S.C. went to push Walker again. No testimony was offered that S.C. turned before he was shot.

{¶ 143} While the State contends Walker brought a gun to a fist fight, there is no evidence that Walker knew or had reason to believe that he would be involved in a fight

45.

that night, much less with a complete stranger. However, there is evidence that S.C. brought a fight and violence to Walker. The evidence shows that S.C.'s initial attack on Walker was more than just a fist fight, as S.C. dominated Walker on the ground with such force that a bystander had to yank S.C. off of Walker. There is evidence that after the attack, Walker tried to ward off further violence from S.C. by flashing, not using, his gun and warning S.C. countless times to get away; this method worked once, but S.C. initiated violence towards Walker a second time, then came at Walker a third time.

{¶ 144} The law does not require Walker to subject himself to an on-going risk to his physical safety. The law allows Walker to defend himself, and the evidence plainly showed S.C. was on the offense with Walker as the target. The law also allows Walker to stand his ground and protect himself. I believe the State did not disprove, beyond a reasonable doubt, that the force Walker used to repel S.C. was not excessive or unreasonable, considering the amount of force and violence S.C. used against Walker in the initial assault, and the subsequent rage S.C. expressed at Walker.

{¶ 145} I therefore believe the State did not meet its burden of disproving Walker's self-defense claim beyond a reasonable doubt.

**Consciousness of Guilt**

{¶ 146} The State argued and presented evidence at trial that Walker's actions after the shooting showed consciousness of guilt. Because I would find that the State did not meet its burden of disproving Walker's self-defense claim beyond a reasonable doubt, there would be no reason for the jury to consider any evidence of Walker's actions *following* the shooting.

46.

{¶ 147} The three elements of self-defense focus on what occurred *before* force was used. In my opinion Walker's assertions are persuasive, whether he fired his weapon in self-defense should be judged solely on the circumstances leading up to and the moment when he fired, and not afterwards, and that his actions of fleeing the scene after the shooting and attempting to disguise his appearance to avoid apprehension are irrelevant to the issue of self-defense. Yet, the vast amount of evidence and arguments presented by the State at trial related to Walker's actions *after* the shooting, not before. It stands to reason that given the State's presentation of the evidence, the jury improperly focused on Walker's actions after the shooting rather than his objective and subjective beliefs up to and at the moment of the shooting.

{¶ 148} In addition, in reviewing consciousness of guilt, I think it is essential to consider the complex realities surrounding self-defense situations. I believe it necessary to consider why a black man might leave the scene after acting in self-defense against a white person. In a high-stress encounter where self-defense was necessary, it is very much a reality that Walker felt an instinctive need to leave the scene due to fear of potential repercussions, including racial bias in the legal system.

{¶ 149} Additionally, the black man might panic or worry about being wrongfully perceived as the aggressor, particularly given the societal context of racial dynamics. The immediate trauma, adrenaline and surprise following an individual defending himself can also contribute to a fight-or-flight response, leading the individual to seek safety. Furthermore, there is no script to follow after an individual acts in self-defense, nor does

47.

the law of self-defense require any actions *after* the incident, such as remaining at the scene.

{¶ 150} These are all compelling reasons and explanations for Walker's actions after he defended himself, without making blanket assumptions regarding consciousness of guilt and why Walker left the scene after the shooting. I believe the jury lost its way by failing to consider and acknowledge the emotional and situational complexity of the racial dynamics at play in this case.

{¶ 151} Therefore, I must respectfully dissent.

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.

48.